# William J. Jamison

*v.*

## The People of the State of Illinois.

*Filed at Springfield, June 15, 1893.*

1. CRIMINAL LAW—*Murder—reasonable doubt as to facts in evidence.* On the trial of one for murder, the court, at the request of the people, gave this instruction: "It is not necessary that the jury should believe that every material fact or circumstance in evidence before them has been proven beyond a reasonable doubt, but that it is sufficient if the jury believe, from the evidence in the case, that every material allegation in the indictment, or either count thereof, in manner and form as therein stated and charged, has been proved beyond a reasonable doubt": *Held,* that there was no substantial objection to the instruction.

2. The rule requiring proof beyond a reasonable doubt, in criminal cases, applies only to the material allegations of the indictment, but has no application to mere evidentiary facts which the testimony of the witnesses may tend to establish. In all cases where the evidence is circumstantial, its primary tendency is to prove certain facts which are merely evidentiary in their character, and from which the ultimate facts to be proved follow as conclusions, either of fact or of law. It is only the latter that must be proved beyond a reasonable doubt.

3. SAME—*instruction as to doubt concerning the sanity of defendant.* On the trial of a murder case the defendant asked this instruction: "The court instructs the jury, that if there is evidence in the case sufficient to raise a reasonable doubt as to the sanity of the defendant, then the jury will find the defendant not guilty." The court gave the same modified, as follows: "The court instructs the jury that if the evidence in the case' is sufficient to raise a reasonable doubt as to the sanity of the defendant, then the jury will find the defendant not guilty": *Held,* that the instruction as asked was properly refused, as it failed to require the reasonable doubt from the whole of the evidence.

4. On the trial of one for murder the following instruction was asked by defendant, but was modified by the court by striking out the word in brackets, and inserting in lieu thereof the words in italics: "While the law presumes all men to be sane, yet this presumption [is] *may be* overcome by evidence tending to prove insanity of the accused at the time of the commission of the alleged offense. When such evidence is introduced, then the presumption of sanity ceases, and the prosecution is bound to prove the sanity of the accused beyond a reasonable doubt. So in this case, in which the defense of insanity is interposed, if the jury, after considering all the evidence, entertains a

reasonable doubt of the sanity of the defendant at the time of the alleged offense, then he must be acquitted" : *Held,* that the modification of the instruction was proper.

5. SAME—*presumption as to sanity—burden of proof.* The legal presumption of sanity may be overcome by evidence tending to show insanity of the accused, which is sufficient to raise a reasonable doubt of his sanity at the time of the commission of the act for which he is sought to be held accountable. When that is done the presumption of sanity ceases, and the burden shifts to the prosecution, and it is then required to prove his sanity as an element necessary to constitute crime.

6. SAME—*admission of part of conversation to show insanity—entitled to all of it.* When a conversation is proved with a party for the purpose of laying a foundation for the admission of the witness' opinion as to his sanity, such witness is bound to give in evidence the entire conversation, so far at least as it formed a part of the ground upon which the opinion was based.

7. SAME—*witnesses—as to sanity.* Non-professional persons having more or less acquaintance with a defendant on trial for crime, who have had an opportunity either of conversing with him, or of observing his conduct and demeanor, either before or shortly after the commission of the crime, may give their opinion as to his sanity, based upon facts detailed by them.

8. The rule is, that non-experts, who have had an opportunity to observe a person, may give their opinion as to his mental condition or capacity, at the same time stating their reasons and the facts observed on which they base their opinions, including conversations as a part of the observed facts, but to render such opinions admissible they must be limited to conclusions drawn from the specific facts thus disclosed.

9. SAME—*evidence in a criminal case—attempt to escape.* On the trial of one for murder it is competent for the people to show the circumstances of the pursuit and capture of the defendant after the homicide. In criminal cases evidence is often given of the conduct of the party either before or after being charged with the offense, not as a part of the *res gestæ,* but as indicative of a guilty mind.

10. SAME—*resisting arrest.* On the trial of one on a charge of crime, it is competent for the prosecution to prove an attempted escape of the accused. On the same principle, acts of the accused, by way of resisting or preventing arrest, may be shown.

11. SAME—*instruction as to intoxication.* Where there is some evidence tending to show the intoxication of one tried for murder, it will be proper to instruct the jury on that hypothesis.

12. EVIDENCE—*objecting generally to proof of a conversation.* When a part of a conversation is given in evidence, under a general objec-

tion, there will be no error in allowing a question calling for the remainder of the conversation which is also objected to generally.

13. SAME—*limiting application by instructions.* When evidence is competent for any purpose it can not be excluded, but must be received, and if it is competent only for one purpose, the other party will be entitled by instructions to have it limited to the purpose for which it is proper.

14. CHANGE OF VENUE—*issue presented by the petition and affidavits.* Under the statute in relation to changes of venue on account of the prejudice of the inhabitants of the county, where the defendant is charged with murder, the material issue to be tried upon the petition and affidavits filed by the accused, and the traverse and counter-affidavits filed by the prosecution, is, whether there is in fact a prejudice in the minds of the inhabitants of the county sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in the county.

15. The question to be determined on such application is not whether the evidentiary facts detailed in the petition are proved, but whether, upon all of the evidence submitted, there is reasonable ground for fear that the alleged prejudice actually exists.

16. CONTINUANCE—*want of diligence.* The court refused to grant a second continuance, in a capital case, on the ground of the absence of certain witnesses residing near Nashville, Tennessee. It appears that five months had elapsed since the prior continuance, without any steps being taken to procure the attendance of such witnesses, further than writing a letter to one of them; and it also appeared that the witness written to came and was present at the trial, but the others did not come, though their journey from Tennessee to the place of trial need not have taken more than one day: *Held,* properly refused, for want of sufficient diligence.

WRIT OF ERROR to the Circuit Court of Adams County; the Hon. OSCAR P. BONNEY, Judge, presiding.

Mr. WM. W. BERRY, for the plaintiff error:

The court erred in refusing the application for a change of venue, and in overruling defendant's motion for a continuance.

The court erred in the giving, refusing and modifying of instructions and in the admission of improper evidence.

Mr. M. T. MOLONEY, Attorney General, Mr. CARL E. EPLER and Mr. J. C. THOMPSON, for the people:

The ground of this motion was the alleged prejudice of the inhabitants of the county against the defendant. The material allegations of the petition of the accused for a change of venue were denied by the State's Attorney, generally and specifically. This formed an issue of fact on the petition, and the question was whether the inhabitants of the county were prejudiced against defendant. This the judge had to decide on the affidavits presented, according to the right of the case, in his sound discretion. See chap. 146, 2 Starr & Curtis' Stats. 2456; *Dunn* v. *People*, 109 Ill. 641; *Price* v. *People*, 131 id. 229; *Hickam* v. *People*, 137 Ill. 75.

The court is not bound by the statements of the party, but must ascertain if the fact of such prejudice exists. *Maton* v. *People*, 15 Ill. 537; 1 Bishop Crim. Proc., sec. 71.

Even were such newspaper articles published, the question would be, had they produced a prejudice in the minds of the inhabitants of the county against the defendant or not. *Dunn* v. *People*, 109 Ill. 641.

And the same rule must be applied to other matters alleged in the petition.

The counter-affidavits showed that no such prejudice existed. "If a prejudice existed and was well spread in the county, it is unreasonable to believe that reliable men would be so reckless as to come forward and file such affidavits," as was said by this court in *Hickam* v. *People*, 137 Ill. 75.

The court below, in the exercise of a sound discretion, with such evidence before it, rightly refused to grant the change of venue, and in such cases, where the judge has a discretion, it is the policy of this court not to interfere with his decision, unless an abuse of the discretion is shown. *Price* v. *People*, 131 Ill. 229; *Dunn* v. *People*, 109 id. 641; *Hickam* v. *People*, *supra*: *Barron* v. *People*, 63 Ill. 256; *Maton* v. *People*, 15 id. 537.

The affidavit for a continuance does not state that the accused did not have time to prepare for trial, or that in the interval the attorney was engaged in other causes. It was not based on want of time. *Dacey* v. *People*, 116 Ill. 560; *Dunn* v. *People*, 109 id. 635.

Evidence of flight is always admissible as tending to show guilt, if unexplained. *Fox* v. *People*, 95 Ill. 71; *Barron* v. *People*, 73 id. 260; Wharton's Crim. Ev., sec. 750; 1 Wharton's Crim. Law, sec. 714; 1 Bishop's Cr. Proc., sec. 1250.

The voluntary statements and admissions by the prisoner, when captured, were competent evidence for the people. *Hanrahan* v. *People*, 91 Ill. 142; 1 Bishop's Crim. Proc., sec. 1247.

Anything in the acts, words or conduct of the accused that threw light on his mental condition and his sense of right or wrong as to the act done, was competent as bearing on the question of criminal intent.

That such evidence was material and competent, especially when insanity is the defense, the test being whether the defendant could distinguish between right and wrong as to the particular act done, is shown by the Illinois decisions. *Dacey* v. *People*, 116 id. 555; *Dunn* v. *People*, 109 id. 635; *Upstone* v. *People*, 109 id. 169; *Chase* v. *People*, 40 id. 352; *Hopps* v. *People*, 31 id. 385.

Evidence of the state of his mind both before and after the act done was admissible. 2 Greenleaf on Ev., sec. 371; *Grant* v. *Thompson*, 4 Conn. 203.

The rebuttal testimony was competent. Witnesses, who are not experts, may give their opinions, founded upon observation, on the question of sanity. *Upstone* v. *People*, 109 Ill. 169; *Roe* v. *Taylor*, 45 id. 489; *Rutherford* v. *Morris*, 77 id. 397; *Carpenter* v. *Calvert*, 83 id. 71; *Dacey* v. *People*, 116 id. 555; *Hardy* v. *Merrill*, 56 N. H. 227.

If there is some evidence tending to prove a fact or hypothesis, an instruction may be predicated upon it, without regard to the weight or preponderance of such evidence. *Cook County* v. *Harms,* 108 Ill. 151; *Eames* v. *Rend,* 105 id. 506.

The people's instructions on insanity are in harmony with the Illinois decisions. *Hornish* v. *People,* 142 Ill. 620; *Dacey* v. *People,* 116 id. 555; *Dunn* v. *People,* 109 id. 635; *Upstone* v. *People,* 109 id. 169; *Chase* v. *People,* 40 id. 352; *Hopps* v. *People,* 31 id. 385.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

At the May term, 1892, of the Circuit Court of Adams county, William J. Jamison, *alias* William M. Smith, was indicted for the murder of Charles N. Aaron, and at the September term of the court he was tried and convicted, and his punishment was fixed at death. Sentence having been pronounced upon him in accordance with the verdict of the jury, he has sued out of this court a writ of error, which has been made a *supersedeas,* and the record is now before us for review.

There is little if any controversy as to the fact of the homicide, or the circumstances under which it was committed. Charles N. Aaron, at the time of his death, was a man about thirty-three years of age and unmarried, and was living with his father and mother on a farm in Ellington township, Adams county. His mother was then an invalid, and was suffering from a cancer in her face. Jamison, the defendant, who then gave his name as William M. Smith, was a negro, but claimed to be an Indian doctor, and to have special skill in the treatment of cancers.

On the 15th day of February, 1892, he went to the house where Charles N. Aaron and his parents lived, for the purpose of treating Mrs. Aaron, and an agreement, as it seems, was thereupon entered into between him and Charles N. Aaron, by the terms of which he was to give Mrs. Aaron

treatment for her cancer, and in case of a cure, he was to be paid the sum of $300. Jamison thereupon took up his abode with the Aarons, and remained there until April 19, preparing medicines and applying them to the face of his patient. During that time he slept on a pallet on the floor of the sick room, which was also the family sitting room.

On the morning of April 19, John Aaron, the father, was the first to rise. After making the kitchen fire, and on returning to the sitting room, at about seven o'clock, he found Jamison about getting up, and looking, as Aaron testifies, "as if something was wrong." Nothing was said by either, until Jamison commenced to talk about cutting stalks, saying that he could cut more stalks in a day with a pole than a man could with a team. John Aaron replied that he thought Jamison could not do that, whereupon Jamison retorted: "You are hair-brained, and have not got any sense; you stop and talk to everybody you see." John Aaron testifies that in this conversation Jamison "talked angry and looked wicked." There were then present in the room Jamison, John Aaron and his wife, and Burgess Myers, an employé on the farm. Just then Charles N. Aaron entered the room, and having overheard what Jamison had just said to his father, he remarked to Jamison: "You will have to quit abusing pa; he is in his own house, and you stop it." John Aaron also said: "Yes, please do not talk to me in that way;" and Charles N. Aaron added: "I mean it; you will have to stop." To this Jamison replied: "I will show you what kind of a man I am," and jumped up, put on his hat and set his valise on a chair as if he was going to leave.

At this point breakfast was announced by Mrs. Simonds, the housekeeper, and John Aaron left the room. Jamison then said: "Charley, I want my money for some prescriptions I gave you." To this Charles replied: "You have not cured her yet; when you cure her I am willing to pay you. The agreement was, I was to pay you when you cured

her; you have not cured her yet," and he then went into an adjoining room for the prescriptions, and returned with a large bundle of them, containing, as the witnesses testify, from twenty to fifty, and threw them down on a chair a short distance from Jamison, saying: "Come out and behave yourself." Jamison replied: "You are robbing me; I want my money." Charles then left the sitting room and passed into the dining room. As he did so, Jamison said: "I will show them what kind of a man I am," and went to his valise and took something therefrom, and followed into the dining room, closing the door behind him. He then said two or three times: "Charlie, you are trying to rob me; give me my money, or I will shoot you." Charles replied: "Doc, you will not shoot anybody." Immediately Jamison fired off a revolver which he held in his hand, and Charles N. Aaron fell to the floor mortally wounded, and died of his wound a few minutes afterward.

Jamison then turned his revolver upon John Aaron, and demanded money of him. Aaron begged him not to shoot, saying that he would give him a check, and he thereupon ran across the room and went out, going through the kitchen. Mrs. Simonds here interposed, saying: "For God's sake, do not shoot another here," and Jamison pointed his revolver at her, and said: "Do not say another word or I will shoot you." Jamison then went back across the hall, but immediately returned and chased Aaron around the house to the front door of the dining room. He was then close upon him, and said: "Give me that check; give it to me quick." Aaron thereupon went into the dining room followed by Jamison, and there drew a check in Jamison's favor for $300, Jamison, while it was being drawn, standing over him with his revolver drawn, and telling him to be quick about it or he would shoot. On receiving the check, Jamison left, going in the direction of Cliola, a railway station, about one-half of a mile away.

Jamison went from Aaron's house to Cliola and there inquired for a train for Quincy. Being informed that a train was due at 7:55, he remained at the station a short time, and then started down the railroad track towards Quincy on foot. In the meantime Burgess Myers, having gone to the neighbors and told them what had occurred, a number of men collected and started in pursuit of Jamison, and came within sight of him between Cliola and Eubanks station, a station about two miles from Cliola. When his pursuers came within gun-shot of him, firing commenced between Jamison and his pursuers, they firing at him with guns and he returning the fire with his revolver. The evidence as to whether Jamison or those in pursuit commenced firing is conflicting, but the firing was kept up until Jamison was shot twice, first in his hand and afterwards in some part of his body, and he then dropped his valise, threw away his revolver, and ran to a house near the track, and after attempting unsuccessfully to break in the door, sat down in a chair on the porch, and was there taken prisoner.

At the May term, 1892, of the Circuit Court of Adams county, that being the term at which the indictment was found, the defendant presented to the court an application for a change of venue, on account of the prejudice of the inhabitants of Adams county, which was denied, and the decision of the court denying him a change of venue is assigned for error. The petition alleged in substance, that Charles N. Aaron, the deceased, was a prominent citizen of the county, and a member of the board of supervisors; that the news of his death had spread over the entire county, and had reached the homes of citizens and friends of Aaron in each township in the county; that there are three daily newspapers published at Quincy, each having a large circulation in the county; that immediately after the defendant's arrest each of those papers published one-sided statements in relation to the homicide, which were calculated to create

and did create a lasting prejudice against the defendant among the citizens of the county; that there are many weekly papers published in the county, some of which reach every town and neighborhood in the county; that these weekly papers published one-sided and exaggerated accounts of the killing of Aaron, which were calculated to and did create an undue prejudice in the minds of the people of the county against the defendant; that such feeling was so intense that the defendant feared that he would be forcibly taken from the jail and hung by a mob; that the sheriff of the county was notified from time to time of the intention of the citizens of the county to congregate and take the defendant from the jail and hang him in defiance of law; that to such extent did this feeling and purpose exist, that the sheriff arranged to call to his assistance the police of the city of Quincy to resist such mob, on the giving of an agreed signal; that the sheriff or his deputies or other persons remained on guard all night to guard against the approach of such mob, bent upon hanging the defendant without warrant of law; that at about midnight on the 29th day of April, 1892, a large mob, composed of citizens of the county, and containing many prominent men, went to the jail and demanded the surrender to them of the defendant; that they carried with them sledge hammers of great weight, to be used in forcing whatever obstructions might be between them and the defendant, and also a rope to hang the defendant; that two of those hammers are now in the possession of the sheriff; that the sheriff protected the defendant and refused to turn him over to the mob, and with the assistance of the police, succeeded in dispersing the mob; that prominent citizens of the county have openly stated that the men who arrested the defendant should have hung him while they had him in their hands, and that it is common talk in the county that if the defendant should be acquitted, he would be hung by the people; that prominent citizens of the county have stated that if the defend-

ant should obtain a change of venue, he would never be taken from the county alive, and that the people would never permit him to be removed from the county; that the petitioner fears that he can not, and will never receive a fair and impartial trial in Adams county, because of the prejudice of the inhabitants of the county against him in this case; that the facts upon which he founds such belief are those above set forth, and also the further facts that exaggerated accounts of the killing of Aaron prejudicial to the defendant have been circulated from person to person, and from house to house, throughout the entire county, and the prejudice against the defendant has been spreading through the county since the day of the homicide; that such prejudice has become so general in the county, that it is a frequent occurrence for men who are looked upon as good and substantial citizens and men of influence, to declare upon the streets and within the hearing of passers-by, that the defendant ought to be hung; that some of the men who are thus manufacturing public opinion to the prejudice of the defendant, become angry and excited when any person says that the defendant ought to have a change of venue; that this prejudice is of such character that it is impossible for the defendant to meet and overcome it, and that it is not abating to any extent whatever, but, on the contrary, is becoming more general, and that on account of such prejudice, the defendant believes that it would be unsafe and dangerous for him to go to trial in the county.

The petition was verified by the affidavit of the defendant, and in support of it five other affidavits of residents of Adams county were filed. These were (1) an affidavit of Joseph M. Cleary, stating, in substance, that there had been and still was great excitement over the shooting of Aaron; that the homicide had been generally talked about among the people of the county; that many citizens of the county had said openly and in public places, that the de-

fendant murdered Aaron and ought to be hung; that many had also said publicly that the people ought not to have permitted the defendant to be brought to Quincy, but should have shot or hung him while they had an opportunity; that the affiant had heard these expressions frequently, and from the mouths of different persons, and from persons living in different parts of the county, and that he does not believe that the defendant will receive a fair and impartial trial in the county, on account of the prejudice of the people against him. (2) An affidavit of Edward Noel, that the affiant had heard statements by citizens of the county that the defendant ought to be hung; that he believed that the feeling in the county was such that it was impossible for the defendant to have a fair and impartial trial in the county, and that he had heard as many as eighteen persons, citizens of the county, say that the defendant ought to be taken out of the jail and hung without trial. (3) The affidavit of George T. Morgan, that he had heard statements made by citizens of the county that the defendant ought to be hung for the murder of Aaron; that on the night of the——day of April, 1892, he saw a great number of persons assembled near the court house, and judging from their actions, he believes that the assembly was a mob organized to break open the jail and lynch the defendant; that he believes the feeling in Adams county is such that it is impossible for the defendant to have a fair and impartial trial in the county. (4) The affidavit of George W. Register, that he had heard as many as fifty persons, citizens of the county, say that the defendant ought to be hung, and that he believed the feeling in the county to be such that it would be impossible for the defendant to have a fair and impartial trial therein. (5) The affidavit of Jordan Chavis, that from the statements of different parties which he had heard, he believed that it would be impossible for the defendant to have a fair and impartial trial in the county.

The State's Attorney, on the other hand, traversed the averments of the petition, and in support of his traverse filed the affidavits of three hundred and thirty-seven of the citizens of Adams county, residing in all parts of the county, including among the number many persons holding or having held official positions in the county, and also prominent professional and business men, and men who are shown to have an extensive acquaintance with the people of the county. In these affidavits the affiant stated, each for himself, that he was well acquainted with nearly all the people residing in his township, and had a large general acquaintance throughout the county; that he knew of no prejudice against the defendant existing among the affiant's acquaintances in the county, and did not believe that any feeling existed among any considerable number of persons in the county, other than an earnest desire that impartial, even-handed justice might be done to the defendant on the one hand and the people on the other; that no more interest appeared to be taken in the present case by the residents of the county than is usually apparent in all cases where the charge is murder and the deceased is well known; that on account of the character and social standing of the deceased, and his general acquaintance throughout the county, his untimely death caused considerable comment at the time among his acquaintances, but had ceased to be a general topic of discussion and conversation, and was then, that is, at the time of making the affidavit, only casually referred to, and that from the affiant's knowledge of the temper of the people of the county he had no hesitation in saying that the defendant could have his case tried as fairly and impartially in Adams county as in any other county in the State. In many of the affidavits it was also expressly stated in terms that the inhabitants of the county had no prejudice against the defendant.

In addition to the affidavits above mentioned, which were all in substantially the same language, the State's Attorney

24—145 ILL.

filed the affidavit of John A. Long, who states, in substance, that he was, and ever since the year 1877 had been, a constable in Gilmer township; that he was one of the party who pursued and captured the defendant the morning the homicide was committed, and was the one who shot and wounded him; that there were about twenty men and boys present, mostly armed, and others were gathering rapidly; that no mob violence was attempted; that affiant left the prisoner in charge of those present and went back to Eubanks and telegraphed the sheriff to come for the prisoner; that the defendant was brought back to Eubanks by those in charge of him, where he remained about two hours, until taken away by the sheriff's deputies; that no demonstration was made to shoot or lynch him there, and no spirit was shown except satisfaction that he was in the hands of the law; that Eubanks is about three and one-half miles from the Aaron farm; that the defendant was taken by the officers to Quincy without trouble or interference, and that since then there has been no attempt at mob violence towards the defendant in that neighborhood, or that part of the county; that the feeling in that vicinity and through the county is one of sympathy for the Aaron family, but that no prejudice exists towards the defendant that would prevent him from getting an impartial trial; that affiant is well acquainted in the county, and has talked with many inhabitants of the county since the homicide, and has no hesitation in saying that there is no temper or prejudice against the defendant's getting a fair trial, but the general feeling and disposition is, that the law take its course, and that the defendant be tried fairly according to law, and affiant believes that he can get as fair a trial in Adams county as in any county in the State.

Also the affidavit of C. F. Perry, a reporter of the Quincy Daily Journal, giving a copy of an interview prepared by him and published in that paper, denying the rumor of a contemplated mob by the people of Ellington township, the

reason assigned by the constable in the interview why they had not desired to take the law into their hands being, that they were law abiding men; that while they realized the enormity of the crime, and felt intensely indignant toward the murderer, they knew that we have laws and courts to deal with such offenders, and have full confidence in those lawful methods.

Also the affidavit of Michael Barry, a deputy sheriff of Adams county, that he was well acquainted with the people of every part of the county; that within the last five days he had conversed with over one hundred of the prominent citizens of the county about the case, and was satisfied that the defendant could have a fair and impartial trial before a jury of the county; that there was no such prejudice in the minds of the people of the county as would prevent his obtaining an impartial jury; that the county is very large, having over 60,000 inhabitants.

Also the affidavit of John Vancil, the sheriff of the county, stating that he was well acquainted with the inhabitants of the city and of the various townships of the county; that since the defendant's arrest, the affiant has talked about the case with people from all parts of the county, and knows their general feeling and temper regarding the case; that he had recently talked with at least a hundred prominent citizens from all portions of the county with reference to the defendant, and he did not believe that the minds of the people were prejudiced against the defendant, in such manner as would in any way influence them upon the trial of the cause, or prevent the defendant from having a fair and impartial trial in the county; that the county is a large one, having some 60,000 inhabitants, and the affiant knew of no reason why the defendant could not have a fair and impartial jury from the county to pass upon his case; that no feeling existed among any considerable number of persons in the county, other than a desire that impartial and exact justice may be done the defendant on the one hand, and the people on the other.

Also the affidavit of Henry Steinkamp, giving the population of Adams county as in the other affidavits, and stating that about one-half of the people of the county were Germans, many of whom could not read the English language; that the newspapers referred to in the defendant's petition were all published in English, and that the larger part of their circulation was in the city of Quincy; that the affiant had conversed with a large number of the people of the county with reference to the charge against the defendant, and was free to say that, in his judgment, the defendant could have a fair and impartial trial in Adams county.

Upon the evidence thus presented, the court denied the defendant's petition for a change of venue, and that decision is now assigned for error.

Under the statute in relation to changes of venue, on account of the prejudice of the inhabitants of the county, where the defendant is charged with murder, as that statute has been interpreted by this court, the material issue to be tried, upon the petition and affidavits filed by the accused, and the traverse and counter-affidavits filed by the prosecution, is whether there is in fact a prejudice in the minds of the inhabitants of the county sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in the county. *Price* v. *People*, 131 Ill. 223. It is contended here, as it was in the *Price* case that the issue to be determined is, whether the particular facts upon which the accused bases his fears that he will not receive a fair trial, do or do not exist, and that if those facts are proved, and are of themselves sufficient to raise a reasonable apprehension that the inhabitants of the county are prejudiced against the accused to such a degree that he will not be likely to receive a fair and impartial trial, a case for a change of venue is made out. But in the *Price* case, it was held by a majority of the court, after mature consideration, that the question to be determined was, not whether

the evidentiary facts detailed in the petition were proved, but whether, upon all the evidence submitted, there was reasonable ground for fear that the alleged prejudice actually existed. So, in *Hickam* v. *The People*, 137 Ill. 75, where the same question was presented, we said: "The existence or non-existence of the prejudice of the inhabitants of the county was the issue made and presented to the court for determination, and it was to be decided according to the right of the case, upon the petition and the denial filed by the State's Attorney, supported by counter-affidavits."

It can not be denied that the State's Attorney failed to disprove some of the specific facts set forth by the defendant in his petition. Thus, the statement that, after the defendant was arrested and committed to jail, a mob assembled about the jail bent on taking him out and hanging him without warrant of law, and that they were prevented from accomplishing their purpose by the efforts of the sheriff, with the assistance of the police, is not disposed of or disproved by the counter-affidavits filed by the State's Attorney. Now if these facts, and the other specific facts stated in the petition and not disproved, were conclusive of such prejudice as would be likely to interfere with his obtaining a fair and impartial trial, then clearly the case made by the defendant was not met by the counter-affidavits. But we are unable to see that such conclusive effect should be given them. Standing alone, they doubtless would tend to show a feeling on the part of the people of the county unfavorable to the defendant. But they may all be true, and still there be no such prejudice prevalent generally among the people of the county as would be likely to make it difficult to secure an impartial jury, or as would otherwise interfere improperly with the due administration of justice.

When all the affidavits are considered, we think the conclusion is irresistible, that there was no such prejudice

against the defendant as would justify a reasonable apprehension that he could not be fairly and impartially tried in the county. If such prejudice existed and was prevalent throughout the county, the fact of its existence must have been known to most if not all the large number of citizens whose affidavits were filed by the State's Attorney, and it is unreasonable to suppose that so large a number of men, most of whom appear to have been among the most prominent and widely known citizens of their respective localities, would be so reckless as to come forward, as they have done, and make affidavit that no such prejudice existed to their knowledge. In addition to this, a considerable number of these affiants state expressly and affirmatively that no prejudice against the defendant exists among the people of the county. We are of the opinion that the Circuit Court committed no error in finding that the prejudice alleged was not proved, and in denying the defendant a change of venue.

The next error assigned is upon the refusal of the court below to grant the defendant a continuance. It appears that at the May term, 1892, of the Circuit Court, the term at which the indictment was presented, a motion was made on behalf of the defendant for a continuance, and granted. That motion was based upon an affidavit of Monroe Jamison, the defendant's father, showing that the defendant could not safely proceed to trial at that term, on account of the absence of six witnesses, who were named, and who all resided in Davidson county, Tennessee. The testimony which it was expected these witnesses would give, related to the previous conduct and history of the defendant while in the State of Tennessee, the place where his father and other members of his family resided, the object of the testimony being to prove his insanity. On the 3rd day of October following, that being one of the days of the September term, 1892, of the court, a further motion was entered on behalf of the defendant for a continuance, based upon an

affidavit made by the defendant's counsel, setting up the absence and materiality of three of the six witnesses mentioned in the former affidavit, and also of Monroe Jamison, the defendant's father, stating the evidence which these witnesses were expected to give in the language of the former affidavit. The affiant also stated that he was employed, May 10, 1892, by the defendant's father, to prepare and present the motion for a change of venue, and that being denied, he was further employed by him to prepare and present the motion for a continuance, which was granted; that affiant then agreed with Monroe Jamison to take charge of the defense and to associate with him other attorneys, upon condition that a retainer then agreed upon should be paid to affiant and his associates by August 1, 1892; that such retainer was not paid, because, as affiant believes, of the death of two of Monroe Jamison's children, and of the expenses incident thereto; that on or about August 31, 1892, affiant called at the jail to see the defendant and notify him of the situation, and that the defendant thereupon said to the affiant that he had no use for any lawyer; that he would be protected by a higher power, and that he neither wished affiant nor any other lawyer to take part in his defense; that on the first day of the September term of court, the affiant stated to the court what had occurred between him and the defendant, whereupon the court entered an order that the affiant should take charge of the defense of the cause; that the defendant had been without counsel since the last day of the previous May term, until the affiant was appointed by the court to defend him; that affiant, immediately upon his appointment, wrote a letter to Monroe Jamison, informing him that the cause had been set for Monday, October 3, 1892, and requesting him to be present with the witnesses, but had received no reply, and affiant had no knowledge of the cause of the absence of Monroe Jamison or the other witnesses; that affiant believes the defendant to be insane, and that he was so at the time

of the commission of the homicide charged; that he believes that none of the witnesses were absent with the permission or consent of the defendant, and that he expected to procure their testimony by the next term of court for the trial of criminal cases.

This motion for a continuance was denied, and on the following day the trial was commenced. Monroe Jamison, as it appears, arrived and was present at the trial, but the other three witnesses named in the affidavit did not, and the trial proceeded in their absence. It seems very clear that no such diligence was shown as made it the duty of the court to award a further postponement of the trial. The cause had been once continued on account of the absence of the same witnesses, and nearly five months had elapsed without any steps being taken to procure their attendance. They all lived at or near Nashville, Tennessee, and their journey from that place to the place of trial need not have occupied more than one day. No effort, however, seems to have been made to procure their attendance, beyond writing a letter to Monroe Jamison. He came, but failed to bring with him the other witnesses, and no reason is shown why they might not also have come.

It is next insisted that the court erred in admitting improper evidence offered on the part of the prosecution. A portion of the evidence objected to consisted of testimony detailing the circumstances of the pursuit and capture of the defendant by the crowd of people who gathered on learning of the homicide. This evidence was clearly competent. In criminal cases, a portion of the evidence laid before the jury often consists of the conduct of the party, either before or after being charged with the offense, presented not as a part of the *res gestæ* of the criminal act itself, but as indicative of a guilty mind. Roscoe's Crim. Ev., 18. It has therefore been held perfectly competent for the prosecution to prove an attempted escape of the accused. *State* v. *Williams,* 54 Mo. 170; *Fanning* v.

*The State*, 14 id. 286; 2 Wharton on Evidence, sec. 1269. Upon the same principle, acts of the accused by way of resisting or preventing arrest may be shown.

Objection was also made to evidence of the opinions of several non-professional witnesses as to the sanity of the defendant, admitted in rebuttal. These witnesses were all of them more or less acquainted with the defendant, and had had an opportunity either of conversing with him, or of observing his conduct and demeanor, either before or shortly after the commission of the homicide. Opinion evidence of this character is held to be admissible in this and most of the other States. The rule is, that non-experts who have had opportunities to observe a person, may give their opinion of his mental condition or capacity, at the same time stating their reasons, and the facts observed on which they base their opinions, including conversations as a part of the observed facts, but to render such opinions admissible, they must be limited to conclusions drawn from the specific facts thus disclosed. 1 Greenl. on Ev., sec. 440, note g, and authorities there cited. The witnesses in this case were permitted to state their opportunities to observe the defendant, and then to express their opinion as to his sanity or insanity, based solely upon such observations. Such opinions were admissible.

Among the witnesses whose opinions were thus admitted was A. E. Hess, who had never seen the defendant until a few hours after he was committed to jail, and who then saw him and had a conversation with him in the jail, which lasted, as he says, about half an hour. The witness, after stating that he thought he could form an intelligent opinion from that conversation as to the defendant's sanity, was permitted to state the conversation in detail, and then to express the opinion that the defendant at that time was sane. The defendant's counsel made repeated objections to the testimony of the witness as to the conversation itself, the objection first interposed, and the only specific objection

made being, that it was not evidence in rebuttal. These objections were all overruled, and exceptions were duly preserved.

The witness was the city editor of one of the Quincy newspapers, and the conversation was in the nature of an interview, consisting of questions propounded by the witness and answers given by the defendant. It related mainly [to the circumstances of the homicide, the defendant saying, in substance, that he had no recollection of having shot Aaron ; that he had been attending Mrs. Aaron continuously for several nights, and was very nervous, and had been drinking a good deal of gin, and that on account of his loss of sleep, his nervous exhaustion and the gin he had taken, he was not himself, and had no recollection of what occurred. The witness was then asked what else was said, and to that question a general objection was made and overruled. In answering it the witness proceeded to say, that he asked the defendant about a reward offered at Little Rock, Arkansas, to which the defendant answered, in substance, that some one at Little Rock had put up a job on him there, by sending a lewd woman to his office to be treated, and that she afterwards accused him of an assault with intent to commit a rape; that a friend of his came forward and put up $300 for his bail, and he went to Nashville to get his father to come to Little Rock and straighten the mattter out for him; that his friend advised him to leave town, but that he did not know that any reward had been offered for him until he came to this part of the country. No objection to this evidence, other than the general one above mentioned, was made, nor was any motion made to exclude this portion of the conversation from the jury after its purport became manifest, nor was the court asked to instruct the jury to disregard it.

Even if it be conceded that this portion of the conversation ought not to have been admitted, we can not see that any error was committed by the court in overruling the

objection to the question put to the witness, viz., to state what further was said. As has already been shown, when non-expert witnesses are permitted to give their opinions as to the sanity of the accused, their opinions must be founded upon facts observed by them, and those facts, including conversations with the accused, must be given. Under this rule, the conversation as a whole was admissible, and when the court was called upon to rule upon the question calling for the residue of it, nothing was apparent indicating that any matter was called for which was improper. Under these circumstances, the court could not do otherwise than overrule the objection.

Nor are we able to say that this portion of the conversation should have been excluded even if it had been properly objected to. There is nothing in the record indicating that the evidence of the conversation was not offered by the State's Attorney in good faith for the mere purpose of laying a foundation for the admission of the witness' opinion as to the defendant's sanity. For that purpose he was bound to give in evidence the entire conversation, so far at least as it formed a part of the ground upon which the witness' opinion was based, and when offered for that purpose, we see no ground upon which any part of it could be excluded. Of course, it was competent only for that one purpose, and the defendant was entitled to have it so limited by instructions to the jury. But so long as it was admissible for that purpose, its admission was not erroneous.

Complaint is made of the eleventh, twelfth and thirteenth instructions given to the jury at the instance of the prosecution, which state the law applicable to the hypothesis that the defendant, at the time he committed the homicide, was under the influence of intoxicating liquors. It is not claimed that these instructions fail to state the law correctly, but that there is no evidence of the defendant's intoxication upon which they can be based. It is true, that most of the witnesses testify that, both at the time of the

homicide and at the time of his arrest, he was sober, but the defendant, at the time he was arrested, told one of the witnesses that he was drunk when he shot Aaron, and another witness testified that he acted as if he had been drinking. There being some evidence tending to show intoxication, it was proper to instruct the jury on that hypothesis.

Complaint is made of the seventeenth instruction given for the prosecution, which was as follows:

"It is not necessary that the jury should believe that every material fact or circumstance in evidence before them has been proven beyond a reasonable doubt, but that it is sufficient if the jury believe, from the evidence in the case, that every material allegation in the indictment, or either count thereof, in manner and form as therein stated and charged, has been proven beyond a reasonable doubt."

We are able to perceive no substantial objection to this instruction. It merely holds that the rule requiring proof beyond a reasonable doubt applies only to the material allegations of the indictment, but has no application to those mere evidentiary facts which the testimony of the witnesses may tend to establish. In all cases where the evidence is circumstantial, its primary tendency is to prove certain acts which are merely evidentiary in their character, and from which the ultimate facts to be proved follow as conclusions, either of fact or of law. It is only the latter which must be proved beyond a reasonable doubt.

The following instruction was asked by the defendant's counsel, but was modified by the court by striking out the word in brackets, and inserting in lieu thereof the words in italics:

"While the law presumes all men to be sane, yet this presumption [is] *may be* overcome by evidence tending to prove insanity of the accused at the time of the commission of the alleged offense. When such evidence is introduced, then the presumption of sanity ceases, and the prosecution

is bound to prove the sanity of the accused beyond a reasonable doubt. So, in this case, in which the defense of sanity is interposed, if the jury, after considering all the evidence, entertains a reasonable doubt of the sanity of the defendant, at the time of the alleged offense, then he must be acquitted.''

We think the modification of this instruction was proper. As asked, it was susceptible of the construction that the presumption of sanity is overcome by evidence, however slight, tending to prove insanity, while the rule is, that to overcome it, evidence must be produced sufficient to raise at least a reasonable doubt of the defendant's sanity. The modification brought the instruction into harmony with what is laid down in *Dacey* v. *The People*, 116 Ill. 555, where it was said: ''The presumption of sanity inheres at every stage of the trial until insanity is made to appear by the evidence. The law in this State undoubtedly is, that this legal presumption may be overcome by evidence tending to prove insanity of the accused, which is sufficient to raise a reasonable doubt of his sanity at the time of the commission of the act for which he is sought to be held accountable. When that is done, the presumption of sanity ceases, and the burden shifts to the prosecution, and it is then required to prove his sanity, as an element necessary to constitute crime, beyond a reasonable doubt.''

The defendant also excepted to the modification of his fourth instruction. As asked it was as follows: ''The court instructs the jury that if there is evidence in the case sufficient to raise a reasonable doubt as to the sanity of the defendant, then the jury will find the defendant not guilty.'' The instruction, as given, was modified so as to read as follows: ''The court instructs the jury that if the evidence in the case is sufficient to raise a reasonable doubt as to the sanity of the defendant, then the jury will find the defendant not guilty.'' The finding of the jury should be based upon all the evidence in the case, but the instruction, as

asked, directed the jury to acquit the defendant, if there was evidence in the case sufficient to raise a reasonable doubt in their minds as to the defendant's sanity, however strong may have been the evidence tending to rebut the defense of insanity. There may have been evidence in the case which, taken by itself, was sufficient to raise a reasonable doubt in the minds of the jury, but the reasonable doubt upon which the jury should act, must be one which arises from a consideration of all the evidence in the case. The modification of the instruction therefore was proper.

Finally, it is urged that the verdict of the jury is against the evidence. That the defendant shot and killed Charles N. Aaron in manner and form as charged in the indictment is clearly proved, and in fact is not disputed. The only material conflict in the evidence is to be found in that portion of it which applies to the defense of insanity. We have examined and considered all the evidence bearing upon that defense with that patience and care which the solemnity and importance, both to the defendant and to the public, of the results which must follow our decision, necessarily demand. We shall not attempt here to give a resume of the evidence, but shall content ourselves with saying, that in view of all the evidence in the record, we are unable to find any tenable ground for disturbing the verdict of the jury. The questions presented by the defense of insanity were purely questions of fact, of which the jury were the proper judges, and the case having been fairly submitted to them by proper instructions, we find no basis in the evidence for holding that they have reached a wrong conclusion. We find no error in the record, and the judgment and sentence of the Circuit Court must therefore be affirmed.

*Judgment affirmed.*