[No. 9571.   Department Two.   October 4, 1911.]

THE STATE OF WASHINGTON, *Respondent*, v. H. J. WELTY, *Appellant*.[1]

CRIMINAL LAW—VENUE—CHANGE OF VENUE—LOCAL PREJUDICE—DISCRETION.  The granting or denial of a change of venue in a criminal case on the ground of local prejudice rests in the discretion of the trial court, under Rem. & Bal. Code, § 2018, providing for a hearing upon affidavits, and that the application shall not be granted unless the judge is satisfied that the grounds upon which it is made exist, and § 2019, providing that, if founded upon excitement or prejudice in the county, the court may in its discretion grant a change to another county; and a ruling cannot be reversed where no abuse of discretion appears.

SAME—EFFECT OF NEWSPAPER COMMENT.  The publication of improper newspaper articles tending to create local prejudice against an accused person, does not warrant a change of venue unless the effect of the publication was such that there was danger of the trial jury being influenced thereby.

BANKS AND BANKING—RECEIVING DEPOSITS AFTER INSOLVENCY—EVIDENCE—ADMISSIBILITY.  In a prosecution of a bank officer for receiving deposits knowing that the bank was insolvent, evidence of the value of securities held by the bank and the general reputation for solvency of the makers of notes is admissible.

SAME.  It is also admissible to show transactions involving financial deals some years previously tending to show the accused's knowledge of the bank's insolvency, and to show a deficiency of assets and a motive for subsequent transactions, the state not being confined to the showing of insolvency on the day charged, when the insolvency charged was the result of many previous acts; even though another offense was established by such evidence.

SAME.  In a prosecution of a bank officer for receiving deposits knowing that the bank was insolvent, it is admissible to show that a mortgage for $18,000 was carried on the books as an asset at its face value, when the mortgagor had made a first payment of only $480 on the purchase of the land from the state, and the purchase had been cancelled by the state for failure to make deferred payments.

BANKS AND BANKING—RECEIVING DEPOSITS AFTER INSOLVENCY—KNOWLEDGE—STATUTES.  Under Rem. & Bal. Code, § 2640, providing that every officer of a bank who shall accept deposits or consent

[1]Reported in 118 Pac. 9.

thereto when he knows or has good reason to believe that the bank is insolvent shall be punished etc., authorizes the conviction of the president of a bank for the receipt of deposits by the cashier in the usual course of business on a certain day when the president was absent, if he knew at the time that the bank was insolvent.

SAME — OFFENSES — EVIDENCE OF PRIOR TRANSACTIONS—INSTRUCTIONS. In a prosecution of a bank officer for receiving deposits on a specified date knowing that the bank was then insolvent, in which the insolvency charged did not result from any act on the day in question, but from numerous prior acts, it is not error to refuse to instruct the jury that evidence of prior insolvency and of acts relating to securities held and intending to show the withdrawal of certain assets from the bank prior to the day charged could be considered by the jury only for the purpose of showing defendant's knowledge of the insolvency on the day charged, where it appears that such previous acts by the defendant largely contributed to the insolvency of the bank.

SAME—NOTICE OF INSOLVENCY—DILIGENCE TO DISCOVER—STATUTES. Under Rem. & Bal. Code, § 2640, making it a felony to receive a deposit in a bank when the officer knows, or has good reason to believe, that the bank was insolvent, the officer is guilty if by the exercise of reasonable care and diligence in the performance of his duties, he could have known of the insolvent condition when the deposit was received.

NEW TRIAL—PREJUDICE OF JUROR—DISCRETION—EVIDENCE—SUFFICIENCY. It is not an abuse of discretion in a prosecution for receiving deposits in an insolvent bank to refuse a new trial on the ground of prejudice of a juror, shown by the affidavit of two persons that the juror, before the trial, had stated that he had lost money through the insolvency of the bank, where the juror denied the statement, but recalled a conversation with such persons in which he had stated that another had lost money, and that the conversation had made so little impression that he had forgotten it at the time of the trial.

NEW TRIAL—INSANITY OF JUROR—DISCRETION—EVIDENCE—SUFFICIENCY. Abuse of discretion in refusing a new trial on the ground of the insanity of a juror will not be found, where it appears that eight years had elapsed since the juror had been discharged as cured and adjudged sane, and his examination on his *voir dire* was not brought up on appeal; and an attack of insanity some months after the trial would not show that the juror was insane at the time of the trial.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered November 2, 1910, upon a

trial and conviction of the crime of receiving deposits in a bank with knowledge of its insolvency. Affirmed.

*S. M. Bruce, T. D. J. Healy, A. E. Barnes, Black & Black,* and *Curtis E. Abrams,* for appellant.

*Frank W. Bixby* (*J. W. Kindall,* of counsel), for respondent.

MORRIS, J.—Appellant was tried and convicted upon an information charging that, on the 31st of December, 1909, he was president of the Home Security Savings Bank of Bellingham, and as such officer of such bank, accepted and received a deposit of $400, knowing, and having good reason to believe, said bank to be then insolvent. From such conviction and the judgment imposed thereon, he appeals, urging a number of errors, which will be treated in the order raised.

The first error assigned is that the trial court erred in denying him a change of venue. The application for such change was based upon his own affidavits, that of one of his counsel, and forty-one others from various residents of Whatcom county, together with numerous exhibits from the files of two Bellingham newspapers, containing local and editorial reference and comment upon the affairs of the bank, and appellant's connection therewith, which it is alleged "created an excitement and prejudice in the public mind extending throughout Whatcom county . . . prejudicing the interests of defendant" to such an extent that he could not have a fair and impartial trial. The affidavit of his counsel is to the effect that such great prejudice against defendant existed that it would be impossible to procure a fair and impartial trial jury. The other affidavits are all alike, and set forth that the affiant "is familiar with the sentiment of the people in the said neighborhood concerning the charges against the defendant; that the opinion prevailing in said neighborhood is adverse to the defendant and unfavorable to his interests, and affiant be-

lieves such a prejudice exists and has been created as would make it difficult to obtain jurors who were unbiased in their opinion for the trial in said county because of such opinion and prejudice."

No good purpose would be served by making special reference to the excerpts from the newspaper. They are many, covering a period from April to September. Some of them are bitter attacks upon defendant and his management of the bank, extremely denunciatory of his actions in connection with the matters complained of, and show a decided opinion as to defendant's guilt. Many of them go away beyond justifiable newspaper comment upon a matter of public concern, and are evidently intended to create a prejudice against the defendant and his financial operations. We are, however, not concerned with the character of the articles, but their effect upon the public mind of Whatcom county, and the contention of defendant that they created such a prejudice against him that he could not hope for a trial by a fair and impartial jury in his home county. Opposed to this showing, the state files 199 affidavits from residents in various sections of the county, to the effect that no prejudice or adverse sentiment exists against defendant preventing him from having a fair and impartial trial in Whatcom county. Upon the hearing of this application, the court denied the change, handing down a written opinion in which it finds that "the extent of the business relations of the bank was not so great as to disqualify any considerable number of jurors;" that the organization of the depositors referred to in defendant's affidavit was primarily for the purpose of protecting their interests as creditors of the bank, and no more activity was displayed in this connection than would ordinarily occur in cases of bank failure; and that the newspaper articles have created no such excitement or prejudice against defendant as to prevent the impaneling of a fair and impartial jury; that while some of the people of the county are prejudiced against defendant, the number is small, and no more than is usual in cases of like character.

Our statute relative to change of venue in criminal cases is found in Rem. & Bal. Code, §§ 2018 and 2019.

"The defendant may show to the court, by affidavit, that he believes he cannot receive a fair trial in the county where the action is pending, owing to the prejudice of the judge, or to excitement or prejudice against the defendant in the county, or some part thereof, and may thereupon demand to be tried in another county. The application shall not be granted on the ground of excitement or prejudice other than the prejudice of the judge, unless the affidavit of the defendant be supported by other evidence; nor in any case unless the judge is satisfied the ground upon which the application is made does exist." § 2018.

"If the affidavit is founded upon excitement or prejudice in the county against the defendant, the court may, in its discretion, grant a change of venue to the most convenient county." § 2019.

It is apparent, from a reading of these sections, that the granting or denying of the change of venue is a matter resting entirely in the sound judicial discretion of the trial judge. Such being the statute, the ruling of the trial court cannot be reversed upon appeal, unless the record contains some evidence of its gross abuse, or it is shown that the court's ruling was arbitrary. Such has been our holding whenever such a question has been before us. *McAllister v. Washington Territory*, 1 Wash. Ter. 360; *Edwards v. State*, 2 Wash. 291, 26 Pac. 258; *State v. Straub*, 16 Wash. 111, 47 Pac. 227; *State v. Champoux*, 33 Wash. 339, 74 Pac. 557. Such also is the general rule in construing statutes of like import. 12 Cyc. 243. The rule is not only based upon the statute, but is founded in reason. The trial judge is generally familiar with the local situation; he knows the prevailing sentiment of the people, in so far as it finds oft repeated expression; he knows all the facts and circumstances proper to be considered in determining the matter; he may know the persons who make affidavits suggesting undue excitement or prejudice and can properly estimate the weight to be given such affidavits. A judicial discretion, exercised under such circumstances,

should not be interfered with, unless its abuse is so clearly manifest as to call for a reversal. This necessitates a careful review of the showing made and the ruling of the court thereon, in order to determine the existence or absence of abuse in the ruling complained of. *Kelly v. State*, 52 Ala. 361; *State v. Humphreys*, 43 Ore. 44, 70 Pac. 824.

Having made such an examination of this record, we cannot say it discloses any evidence that the trial judge was unmindful of his whole duty and has abused the power vested in him by the law. We have referred to the character of the newspaper articles sent up as exhibits. Their denunciatory style and prejudicial intent is not of itself evidence of undue excitement or prejudice on the part of the people of Whatcom county. These articles evidence plainly the opinion of those controlling the utterances of the papers and the evident policy of their management; but they cannot be accepted as voicing the sentiment of the people to such an extent as to prevent the trial of defendant before a fair and impartial jury of Whatcom county. It must appear, before we would be justified in reviewing the trial court's ruling, that the community has been so warped by the passion and prejudice of the newspaper articles complained of that there is danger of the trial jury being so influenced by such publication as to give heed to them rather than to the evidence in reaching a verdict. *Muscoe v. Commonwealth*, 87 Va. 460, 12 S. E. 790; *Hickam v. People*, 137 Ill. 75, 27 N. E. 88; *Jamison v. People*, 145 Ill. 357, 34 N. E. 486; *State v. Barton*, 8 Mo. App. 15; *State v. Rhea*, 25 Kan. 576.

It is to be regretted that, when a citizen is charged with a crime, newspapers should seek to mould public opinion, either for or against the accused, and seek to establish his guilt or innocence. Such is not a legitimate field for newspaper enterprise, and is contrary to the spirit of our institutions. Trial courts and jurors have been established to determine that question, and they should be left free to do so without suggestion or advice. The matter is, however, to be judi-

cially determined by the effect of the publication, and not its purpose; and until there is satisfactory evidence that such purpose has been accomplished, the case must be left to take its ordinary course. That the effort failed of accomplishment in this case is to be assumed from the fact that defendant has failed to bring before us the examination of the jurors on their *voir dire*. Not having done so, we can safely assume nothing unusual was disclosed in such examination, and that there was no great difficulty in obtaining a jury because of the publication of these articles. *Edwards v. State, supra; State v. Pomeroy,* 30 Ore. 16, 46 Pac. 797.

Appellant relies upon *State v. Hillman,* 42 Wash. 615, 85 Pac. 63. In that case there was no contrary showing on the part of the state, there was therefore, nothing upon which the discretion of the court could act, it was therefore error to fail to give effect to the uncontroverted facts as shown in the moving papers.

The next assignment is that the court erred in admitting evidence of the value of certain securities held by the bank, and the general reputation for solvency of the makers of certain notes held by the bank. We will not make special reference to these objections as there are a number of them, covering many pages in the record. We have, however, read the evidence, noted the objections, and the rulings of the court, and find no error. That such evidence is admissible seems to be generally conceded. 1 Wharton, Evidence, § 446; 2 Elliott, Evidence, § 1055; *Murray v. Norwood,* 77 Wis. 405, 46 N. W. 499; *State v. Sattley,* 131 Mo. 464, 33 S. W. 41; *State v. Easton,* 113 Iowa 516, 85 N. W. 795, 86 Am. St. 389; *Ellis v. State,* 138 Wis. 513, 119 N. W. 1110, 131 Am. St. 1022, 20 L. R. A. (N. S.) 444.

The next objection is to the admission of evidence of certain transactions prior to December 31, 1909, and in some instances as far back as November 1905, involving financial deals of appellant in connection with the bank, offered by the state for the purpose of showing knowledge of the bank's in-

solvency on the part of appellant. The transactions are too involved to set forth in this opinion; we have, however, read the evidence concerning them, and find no prejudicial error in any ruling complained of. It was claimed by the state, and we think properly so, that this evidence was competent and admissible to show a deficiency in the assets of the bank, and as disclosing a motive for subsequent transactions by which appellant, it was claimed, sought to cover up the deficiency and to inflate the assets and show apparent values in securities that were of no real value. The evidence was certainly proper to show the financial condition of the bank and appellant's knowledge of that condition. It was not claimed that the insolvency charged was the result or effect of one act, but of many acts, and evidence of any one of these acts, contributing to such a result, was admissible. The pertinent question for the jury, it is true, was the condition of the bank on December 31, the day charged; but its condition on any prior day, and the transaction of that day, which helped to produce the insolvent condition on December 31, was admissible and competent. And this would be true even though such evidence might establish some crime other than the one charged, or some collateral or unrelated fact. Underhill, Criminal Evidence, § 90; *State v. Hatch*, 63 Wash. 617, 116 Pac. 286.

The next error charged is in the admission of seven exhibits. These exhibits were records of the land department of the state of Oregon, showing purchase from the state of 960 acres of land June 14, 1907, for $2,400, upon which $480 was paid at the time of purchase, and the balance represented by deferred payments. These lands subsequently passed into the ownership of a corporation known as the Harney Land Company. On September 1, 1907, the Harney Land Company gave its note for $18,000, secured by a mortgage on these lands, which note and mortgage were a part of the assets of the bank on December 31, 1909. Nothing further than the original payment was paid on these lands,

and the certificates of purchase were cancelled by the land department of the state of Oregon, June 16, 1909. This note and mortgage was carried by the bank on December 31, 1909, as a secured asset for the sum of $18,000. Without giving farther detail, this was one of the transactions claimed by the state showing appellant's manipulation of the affairs of the bank by which worthless paper was carried on its books at its full face value, the note and mortgage were alleged to be worthless and a link in the insolvency chain. Evidence of the whole transaction was admissible, and we find no error in this connection.

The next error assigned is the denial of a motion for an instructed verdict, made at the close of the state's opening statement and renewed at the conclusion of the evidence. There was no ground for the granting of either motion. We cannot review what the state disclosed as its case in the opening statement, nor the evidence introduced in support of the information. The opening statement recited sufficient facts, if proved, to establish guilt, and the evidence is ample to support the verdict.

The next complaint is the court's refusal to give two instructions requested by defendant, the first of these was to the effect that the defendant should be returned not guilty if it should be found that he was absent from the bank on December 31, 1909, and the bank was on that day under the control of other officials. There being evidence to the effect that defendant had not been in the bank for three or four days prior to December 31, 1909, and that the deposit was received by the cashier. Our statute, so far as it is pertinent to this inquiry, provides that every officer of any corporation engaged in the banking business, who shall accept deposits or consent thereto when he knows, or has good reason to believe, that such corporation is insolvent, shall be punished, etc. Rem. & Bal. Code, § 2640. The receipt of this deposit was in the usual course of the banking business conducted by defendant, and it was immaterial whether he was

present or absent at the time of the deposit, if he knew, or had good reason to believe, that the bank was at that time insolvent. *State v. Cadwell,* 79 Iowa 432, 44 N. W. 700; *Carr v. State,* 104 Ala. 4, 16 South. 150; *State v. Sattley, supra.*

The next error assigned is the refusal to give defendant's requested instruction 25, as follows:

"Certain evidence has been admitted in this case concerning a number of transactions in connection with the business of the Home Security Savings Bank conducted by the defendant through and with other parties, which tend to prove the withdrawal of certain assets from the bank and substitution of other assets of a different nature therefor. You are instructed that this evidence is only material to the issues in this case in so far as it tends to prove the knowledge of the defendant of its solvency or insolvency upon December 31, 1909. It is material for no other purpose, and has been admitted for no other purpose, and although you may believe that this evidence tends to show the commission of other misdemeanors or crimes on the part of the defendant not charged in the information, or the commission of fraudulent acts and deeds on his part in connection therewith, yet you are instructed that unless you believe from the evidence beyond a reasonable doubt that the defendant was president of the Home Security Savings Bank on December 31, 1909, that on said date the bank was unsafe and insolvent, and that the defendant on said date knew or had reasonable cause to know it was unsafe or insolvent, then you should find the defendant not guilty."

The last phase of this request, relative to the condition of the bank on December 31, 1909, and defendant's knowledge of that condition, is unquestionably sound, and the court, in many instances throughout its instructions, so told the jury. The first phase, limiting the effect of the testimony to proving defendant's knowledge of insolvency on December 31, 1909, is an improper limitation, and the refusal to instruct was not error. It is manifest, as touching the question of insolvency, there were two primary ingredients, first, the insolvent condition; second, defendant's knowledge of such a

condition. He could have no knowledge of a condition not shown to exist; hence, the first thing to be determined by the jury was, Was the bank insolvent on December 31, 1909? Such a condition, if existing, could only, so far as the situation here is involved, exist as the result of defendant's acts prior to December 31. It was not charged that he did anything on that day that resulted in the insolvency of the bank, it was the result, as before intimated, not of one act, but of a number of acts, not in themselves related, but each having its part in the general resulting condition. These acts were therefore material and relevant to show the insolvent condition, in so far as they had been a material factor in that condition. They were the causes of an effect charged as existing on December 31, and the state had a right to prove them, and the jury had a right to consider them. Had the defendant requested an instruction to disregard such transactions except in so far as they were found to have contributed to the insolvent condition, it would have been a proper request and doubtless complied with. So far as the evidence shows, the jury would have been justified in finding the bank was insolvent from the time of appellant's first connection with it.

The situation briefly was this: Appellant purchased a controlling interest from Mr. Cissna in November, 1905, for $108,000. This payment was made up by certified checks and drafts to the amount of $80,000, and defendant's note for $28,000. Mr. Cissna then deposited these credits in the bank in the account of the Home Loan Company of which he was president. Of this $80,000, $15,000 was subsequently received by the bank in payment of three $5,000 notes given for stock. The checks and drafts to the amount of $65,000 were returned by defendant to the parties issuing them, in return for his notes. Geo. B. Burke, a stockholder and the cashier of the bank, discovered the situation early in the following December, and confronted defendant with it, who

promised to make the deficiency good, and for such purpose obtained a number of notes from various people. These notes, and other securities succeeding them, were among the assets on December 31, 1909, that were attacked by the state as worthless or of a value much less than their face value. That this juggling of this $65,000 credit contributed to, and was largely responsible for, the condition of the bank on December 31, 1909, could hardly be doubted.

The next error assigned is the giving of instruction No. 14, the pertinent part of which is,

"And if the defendant as such president, by the exercise of such reasonable care and diligence in the performance of his duty as president as a person of ordinary prudence would have exercised under like circumstances, could have known of the unsafe and insolvent condition of the bank at the time charged, but did not actually know of such condition, then the defendant would be charged with such knowledge of such unsafe and insolvent condition of the bank, and the fact that he did not actually know of the unsafe and insolvent condition of the bank in such case would constitute no defense in this case."

In those states where actual knowledge of the insolvent condition is the gravamen of the crime, this instruction would undoubtedly have been error, and cases cited from those states so hold; but our statute does not confine the offense to actual knowledge, but reads, "When he knows or has good reason to believe," the bank is unsafe or insolvent. Hence, actual knowledge is not required, and it was sufficient to show facts from which the jury might find that defendant had "good reason to believe" the bank was insolvent. Under statutes like ours, knowledge of the bank's condition is both presumed and required. *State v. Quackenbush*, 98 Minn. 515, 108 N. W. 953. Construing a statute subjecting an officer who "has good reason to know" the insolvent condition, to the offense, the court says: "This rule is consistent with the general principle that a person is presumed to

know what it is his duty to know." Citing cases. In *State v. Cadwallader*, 154 Ind. 607, 57 N. E. 512, it is said:

"It is the imperative duty of such officers, when they receive deposits from the bank's patrons, to know that the bank is solvent, if, under the circumstances, by the exercise of reasonable diligence such fact could have been ascertained. If, by the exercise of such diligence in making an examination and inquiry in respect to the solvency or insolvency of the bank, its true condition could have been discovered, then, under such circumstances, the presumption will be that they had knowledge of the bank's condition at the time the particular deposit was received."

See, also, *Meadowcroft v. People*, 163 Ill. 56, 45 N. E. 303, 54 Am. St. 447, 35 L. R. A. 176; *McClure v. People*, 27 Colo. 358, 61 Pac. 612; *State v. Buck*, 120 Mo. 479, 25 S. W. 573. "Good reason to believe" implies not only knowledge, but an investigation into such facts as would give knowledge. Such investigation means not a haphazard, casual investigation, but a reasonable investigation, diligent inquiry, and prudent search. For these reasons the instruction is sustained.

The last error claimed is in denying a motion for a new trial, which appellant asserts he was entitled to because of bias and prejudice on the part of juror Snyder, and a contention that juror Weidcamp was insane. Two persons make affidavit that in a conversation had with Snyder a few days before his selection as a juror, he stated he had lost money because of the bank failure, and expressed great antipathy toward defendant. These assertions are denied by Snyder, who admits having a conversation with the two persons making the affidavits about two weeks before the trial, in which the bank failure was mentioned and he was asked if he had lost any money, to which he answered that he had not, but a man who had intended to build a small house had informed him he could not do so because of the failure of the bank; that the matter made so little impression upon his mind that he forgot it, and made no mention of it upon his

examination as a juror. The granting of a new trial upon controverted questions of fact is so largely a matter of discretion with the trial judge that his ruling thereon will seldom be disturbed, and then only when there is evidence in the record of an abuse of such discretion. We find no such evidence here. *Heasley v. Nichols*, 38 Wash. 485, 80 Pac. 769, cited by appellant is not in point. In that case there was a showing of bias and prejudice on the part of a juror which was not denied. This showing was made by all parties to the record. It was the plain duty of the court to give effect to such a showing, there being no controversy calling for the exercise of any judicial discretion. We are not convinced that the court below erred in its ruling upon this feature of the motion, and the ruling is sustained.

As to the juror Weidcamp, it appears that he was adjudged insane and committed to an asylum on March 16, 1898, from which he was discharged as cured June 23, 1898. He was again adjudged insane and recommitted November 30, 1901, and discharged April 4, 1902. This trial began September 19, 1910, so that over eight years have elapsed since the discharge of the juror as cured. His examination on his *voir dire* is not brought up, hence we assume there was nothing in his examination to indicate that he was lacking in mental qualifications. Both the state and defendant having accepted him as a juror, it is evident his examination and appearance impressed them both favorably. It would be folly to say that the fact that a man who had suffered from some mental disease eight years ago and had been pronounced cured, who gave no signs of any mental disturbance, would vacate any verdict of which he was a part. It is evident, whatever the difficulty was, it was of a temporary nature, such a condition is not presumed to continue, and whoever relies upon such a condition once shown to exist, must prove its existence at the time it is alleged. 16 Am. & Eng. Ency. Law (2d ed.), 606, and cases cited. There was no such show-

ing as would justify the trial court in holding that the juror was insane at the time of the trial, or that he was suffering from any mental disturbance that would in any wise affect his competency. After the removal of the cause to this court, and on May 5, 1911, appellant files an original showing here, consisting of copies of a complaint in insanity, physician's certificate, and commitment of this juror on March 11, 1911. From the physician's certificate it appears that this attack first appeared about a week previous to the hearing. It is doubtful if we may properly consider this showing. We could not assume, however, that an attack of insanity about March 1, 1911, would show the patient was insane while sitting as a juror from September 19 to October 3, 1910. Nor could we lay down a rule that the subsequent insanity of a juror would vacate a verdict returned by him, without at least a very strong showing that he was so insane at the time he sat as such a juror.

Finding no error, the judgment is affirmed.

DUNBAR, C. J., ELLIS and CROW, JJ., concur.