## FIDELITY & DEPOSIT CO. OF MARYLAND et al. v. KELSO STATE BANK et al.

(Circuit Court of Appeals, Ninth Circuit. February 26, 1923. Rehearing Denied April 16, 1923.)

No. 3920.

1. **Banks and banking ⬳82(7)—Burden is on plaintiff to show actual insolvency and knowledge by managing officers.**

The burden is on plaintiff, who is seeking to recover from an insolvent bank a deposit made shortly before the bank closed, to show that real fraud was practiced on the depositor, which requires affirmative proof, both that the bank was actually insolvent when it received the deposit and that its managing officers knew that to be the fact.

2. **Banks and banking ⬳75—Bank officer not chargeable in civil action with knowledge obtainable by reasonable diligence when deposit was received.**

Since there is no statutory provision relating to the liability of a bank a trustee ex maleficio for deposits received when insolvent, similar to the provision, in the statute making it a felony to receive a deposit in a bank knowing it to be insolvent, that knowledge of insolvency is imputed to the officer if by the exercise of reasonable care and diligence he could have discovered it, it is essential, to charge the bank as trustee, to show actual knowledge by its officers of the insolvency, and proof they could have discovered insolvency by the exercise of reasonable diligence is insufficient.

3. **Banks and banking ⬳82(7)—Evidence held not to show officers knew bank was insolvent when deposit was received.**

In a suit to recover from an insolvent bank deposits made shortly before the bank's insolvency, evidence *held* insufficient to sustain the plaintiff's burden of proving that the officers of the bank knew at the time the deposit was received that the bank was hopelessly insolvent.

4. **Banks and banking ⬳82(7)—Evidence held not to raise county deposits into warrants acquired by bank.**

Evidence that part of the money deposited by plaintiff's assignor had been used by defendant insolvent bank to pay a loan to a national bank, for which county warrants had been pledged as collateral security, and that after payment of the loan the warrants were left with the national bank, *held* insufficient to trace the deposit into those warrants, though the collateral pledge was in the form of a sale of the warrants to the national bank with an option to repurchase.

5. **Banks and banking ⬳116(6)—Cashier's knowledge of his misconduct, rendering bank insolvent, is not imputed to bank.**

Knowledge by the cashier of a bank that he had been juggling the accounts and making unduly large loans without sufficient security, so that the bank was in fact insolvent, is not imputed to the bank.

Ross, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in equity by the Fidelity & Deposit Company of Maryland and another against the Kelso State Bank and others. Decree for defendants, and complainants appeal. Affirmed.

McCamant & Thompson, of Portland, Or., and Grinstead & Laube, of Seattle, Wash. (Wallace McCamant, of Portland, Or., and Loren Grinstead, of Seattle, Wash., of counsel), for appellants.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

Miller, Wilkinson & Miller, of Vancouver, Wash. (A. L. Miller, of Vancouver, Wash., of counsel), for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge. The Kelso State Bank, of the state of Washington, closed its doors on March 17, 1921. At that time the county treasurer of Cowlitz county, Wash., was credited on the books of the bank with funds of the county aggregating $64,460.96, which were secured by the bonds of the appellants. Thereafter the appellants paid the county treasurer the amount so credited to him and took assignments of the claims of the treasurer and of the county against the bank. The last two deposits of the county funds were made on March 9 and March 14, 1921. They were general deposits, not special. The deposit of March 9 was $6,752.55. The deposit of March 14 was $35,337.57, and it included a draft on Pope & Talbot, of San Francisco, for $32,897.97, payable to the county treasurer for taxes due the county. The cashier of the bank took the Pope & Talbot draft and $6,500 cash to the United States National Bank of Portland, and deposited the same, making, with the credit which it already had, a total deposit of $55,370.61, against which was charged $33,491.59, the amount of a loan which the Kelso bank had obtained from the Portland bank, and which had been secured by the pledge of certain warrants belonging to the Kelso bank. The appellants in their complaint alleged that at the time when the deposits of March 9 and March 14 were made the Kelso State Bank was hopelessly insolvent, that its hopeless insolvency was known by the officers of the bank, and that the title to the county funds so deposited did not pass to the bank, but remained in the county. They further alleged that with such deposits the bank purchased warrants amounting to $33,-491.59, which became the property of Cowlitz county. Upon the pleadings and the evidence the court below found for the appellees and dismissed the appellants' bill.

[1] The burden of proof was upon the appellants to show that real fraud was practiced upon the depositor to whose rights they became subrogated. To do this they were required to show affirmatively both that the bank was actually insolvent when it received the deposits and that its managing officers then knew this to be the fact. Furber v. Dane, 204 Mass. 412, 90 N. E. 859, 27 L. R. A. (N. S.) 808; St. Louis Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683. In the leading case of Quin v. Earle (C. C.) 95 Fed. 728, Judge Gray said:

"If the president and officers of the bank knew or believed that the bank was hopelessly and irretrievably insolvent at the time of receiving the deposit of the complainant, then a fraud was undoubtedly committed by the bank upon the complainant, for which there should be a remedy. But fraud must be proved, and is not to be presumed, and the burden of proof is on the complainant. The mere fact that the bank was in an embarrassed condition, by reason of the large indebtedness to it from its president, is not sufficient of itself to establish the fraud alleged in this case."

A similar ruling was made in Brennan v. Tilinghast, 201 Fed. 609, 120 C. C. A. 37. In Williams v. Van Norden Trust Co., 104 App. Div. 251, 93 N. Y. Supp. 821, the court said:

"The mere fact of insolvency at the time the deposit was received is not sufficient to justify a finding of fraud, but the insolvency must be of such a character that it was manifestly impossible for the bankers to continue in business and meet their obligations, and that fact must have been known to the bankers, so as to justify the conclusion that the bankers accepted the depositor's money knowing that they would not and could not respond when the depositor demanded it. It is fraud that must be proved. An honest mistake as to the condition of the bank and an honest belief in the solvency of the institution, if it exists, negative the conclusion of the fraud upon which the plaintiff's cause of action must depend."

The court further said:

"The court was certainly not justified in refusing to believe the witness, and without further evidence, finding the exact contrary from his testimony, because of the fact that he was a party to the action, and therefore an interested witness."

In New York Breweries Co. v. Higgins, 79 Hun, 250, 29 N. Y. Supp. 416, Judge Parker held that a deposit made in the usual course of business vests in the bank, and cannot be recovered by the depositor on the ground of fraud, though the bank was insolvent and failed on the next day, and though the deposit was made in reliance on representations of the president that the bank was all right, unless the officers of the bank knew of its insolvency at the time of the deposit.

[2] The appellants cite State v. Welty, 65 Wash. 244, 118 Pac. 9, but the principle which controlled decision in that case has no application to the case at bar. That was a criminal proceeding under a statute which made it a felony to receive a deposit in a bank when the bank officer knows or has good reason to believe that the bank is insolvent. Knowledge of insolvency was by the statute imputed to the officer, if by the exercise of "reasonable care and diligence" he could have discovered it. There is no imputation of knowledge of insolvency in aid of the recovery of deposits received by an insolvent bank. In such case, in order to charge the bank as a trustee ex maleficio, its officers must have had actual knowledge of its hopeless insolvency, and it is not enough if by the exercise of reasonable care and diligence they could have discovered it.

[3] The court below, on the testimony heard in open court, found that, while the bank was in fact insolvent when it received the deposits in question, in that it did not possess sufficient solvent and marketable assets to meet its obligations, it was still a going concern and continued to receive deposits, pay checks, and to do general banking business for three days thereafter, until forced to close by order of the banking department. And said the court:

"So far as I can ascertain from the evidence, the officers of the bank did not know or believe at that time that the bank was hopelessly and irretrievably insolvent, but thought it would be able to continue in business."

The evidence amply sustains that conclusion. Not only so, but there is no evidence to the contrary. The finding of the trial court rests not so much upon the testimony of the defendants as upon the testimony of the appellant's witnesses. One of the witnesses called for the appellants was the assistant cashier of the bank. He testified

that about March 13, 1921, he and his brother and the president of the bank made an examination of the assets of the bank, in view of a possible purchase of the bank by the witness and his brother; that they found about $100,000 of paper that was questionable, but that Stewart, the cashier, strenuously maintained that a large part of the paper which the others thought was worthless would in his opinion eventually be paid. Said the witness: "It was largely a matter, then, of a difference of opinion." The witness testified that Stewart spoke optimistically of the condition of the bank, and said that "we would come out all right." The witness added, "I honestly do think that he thought we would at that time." The bank commissioner of the state of Washington, a witness for the appellants, testified:

That he did not conclude that the bank ought to be closed until after he had had a conversation with one of the stockholders on March 16, 1921. "Up until that time, with all that I knew about the bank, I did not feel that there was sufficient justification to close it; and none of the officers (of the bank) felt that way; they all believed that it would work out. Until the very last, I think they were confident that it would work out."

The deputy supervisor of banking corroborated the other witnesses called by the appellant, in that the embarrassment of the bank arose from the large number of doubtful loans it had made. He testified that Stewart represented that the assets were all right. Said the witness:

"I felt that his contention regarding the assets might be genuine in his own mind; but I could not feel that his value of the assets was correct. * * * Mr. Stewart was very insistent that he would be able to collect on these papers. His statements were that always he felt that he could work those papers out. I believe he was sincere in his belief."

[4] Again, there was failure to trace the deposits of the county treasurer into the warrants which the Kelso Bank left with the United States National Bank. The court below found the evidence to be clear that the purpose of the Kelso Bank in leaving the warrants with the United States Bank was that it might thereby be enabled to obtain future deposits of county funds, and that the warrants were not purchased by the Kelso Bank from the United States Bank, and that they never did belong to the latter bank. The evidence fully sustains this view of the transaction between the two banks. The warrants had been the property of the Kelso Bank several months before its suspension. That bank had deposited them with the United States Bank in September and December, 1920, only as collateral security for loans made by the latter bank to the former.

The appellants point to the fact that, when the warrants were so deposited with the National Bank, the Kelso Bank executed instruments which recited a sale of the warrants to the former bank, together with the promise of the Kelso Bank to repurchase the warrants at par on or before 90 days after date. These instruments were merely a device to evidence the actual transaction between the parties, and they did not in any way affect or alter the understanding between them. The National Bank carried the transactions upon its books as loans and collected no interest on the warrants, but charged interest on the loans which was paid by the Kelso Bank.

[5] The appellees in their answer to the bill of complaint alleged that Stewart, the cashier, was intrusted with the general management of the affairs of the bank, and that he juggled the accounts and misused and appropriated the funds, and mismanaged the assets of the bank, and loaned its funds to irresponsible persons, and by reason thereof the bank became unsound. It does not follow from this that Stewart believed the bank to be insolvent at the time when the deposits in question were made, nor was his knowledge of his own mismanagement imputable to the officers of the bank. Directly in point is the decision of Vice Chancellor Pitney in Perth Amboy Gaslight Co. v. Middlesex County Bank, 60 N. J. Eq. 84, 45 Atl. 704, holding that the fact that a cashier of a bank who had abstracted funds therefrom knew the bank was insolvent was not notice of such insolvency to the other officers. Said the Vice Chancellor:

"Of course, it almost goes without saying that the fact that the cashier knew for months that the bank was insolvent is not notice to the other officers of the bank. It might as well be argued that an owner of a chattel which has been stealthily stolen from him by his employé is chargeable with notice of such theft, and estopped from asserting his title to the stolen chattel when found. The authorities are all against the appellants in this respect. It is not necessary to cite them."

So in Terhune v. Bank of Bergen Co., 34 N. J. Eq. 367, the directors of a bank discovered that their cashier had embezzled the funds, but not to such an extent, as they then supposed, as to render the bank insolvent. The following day the bank received a deposit. On the next succeeding day the bank suspended through insolvency. It was held that the depositor was not entitled to preference in payment, there being evidence that at the time when the deposit was made the directors thought the bank was solvent.

The foregoing view of the merits of the case renders it unnecessary to discuss the defense, pleaded and relied upon by the appellees, that on April 25, 1921, the appellants had each presented its claim to the liquidating officer of the bank, which claims were approved, and that thereafter the appellants had received dividends on their claims, whereby they were estopped to assert a preference.

The decree is affirmed.

ROSS, Circuit Judge (dissenting). I respectfully dissent. At the time the appellee bank was closed by order of the banking authorities of the state of Washington, which was March 17, 1921, it had in cash only $17,189.32, but the county treasurer of Cowlitz county, of that state, had a credit balance on the books of the bank of $64,460.96 for public funds which had been deposited by him at various times, commencing January 25 and ending March 14, 1921, on which deposits the bank was paying interest on the daily balances. Those deposits were secured by bonds executed by the two appellant surety companies —the bank being principal in each of the bonds. Subsequent to the closing of the bank, the surety companies paid the treasurer of Cowlitz county the amount credited to him on the books of the bank, with the accrued interest thereon, of which amount the Fidelity & Deposit Company paid $46,066.06 and the Maryland Casualty Com-

pany $18,426.43, taking assignments of the claim of the county against the bank. None of the money so deposited in the appellee bank constituted a special deposit.

The last two deposits made by the county treasurer were made March 10 and March 14, 1921, respectively, the first of which was in the sum of $5,136.41, and a part of the second of which was evidenced by a draft drawn by the Puget Mill Company on Pope & Talbot of San Francisco for $32,897.98. That draft the cashier of the bank—one Stewart—took, on the same day, with other paper of the value of $6,500, to the United States National Bank of Portland, in the city of Portland, and with it took up certain warrants of the county of Cowlitz which the Portland bank had been carrying as security for credits it had given the Kelso State Bank. Upon so releasing the warrants, the cashier of the Kelso bank on the same day left them with the Portland bank for safe-keeping, as shown by this receipt:

"The United States National Bank.
"No. 1469.                                    Portland, Oregon, 3—14—21.
"Received from Kelso State Bank, address, Kelso, Washington, for safe-keeping only and at your risk, securities purporting to be as follows: Cowlitz county warrants, $33,491.59, not negotiable, held as security for deposits of county funds, county treasurer, Kalama, Wash.
"[Rubber stamp]    Paul S. Dick, Cashier-Prest.
"[Signed]   W. R. Choate, Teller."

Annexed to the receipt was a list of the warrants.

The warrants, according to the record, are still in the possession of the Portland bank, which was made a party defendant to the action; but upon the trial, that bank having disclaimed any interest in the warrants and having offered to turn them into the registry of the court, the court, upon the agreement of all parties, discharged the Portland bank from liability, but directed it to keep the warrants until the further order of the court.

The case of the appellants rests upon the contention that the appellee bank was, at the time of the deposit, among other things, of the Pope & Talbot draft in it by their assignor, the treasurer of Cowlitz county, hopelessly insolvent, and known to be so by its officers. The court below held that, while it was undoubtedly true that it was then insolvent in the sense that it did not possess sufficient sound and marketable assets to meet its obligations, it was a going concern and continued to receive deposits, pay checks, and do a general banking business for three days thereafter, and until forced to close by order of the banking authorities of the state, and that the officers of the bank did not know or believe at the time of such deposit "that the bank was hopelessly and irretrievably insolvent, but thought it would be able to continue in business."

In the opinion of the majority of this court, it is declared that "the evidence amply sustains that conclusion; not only so, but there is no evidence to the contrary." I am unable to take that view of the evidence. The record leaves no room for doubt that the condition of the bank and its insolvency was brought about by the dishonesty of its cashier, Stewart, who seems to have disappeared, and whose where-

abouts are unaccounted for. In the answer of the appellees, filed to the amended complaint, it is expressly alleged that for several years prior to the time referred to in the complaint—

"one F. L. Stewart was employed as the cashier of the Kelso State Bank, and intrusted with the general management of the affairs of the bank, and given control and possession of the funds, securities, and properties of the bank; that from time to time the said F. L. Stewart juggled the accounts, misused and misappropriated the funds of the bank, misused and mismanaged the assets of the institution, and loaned the funds of the bank to irresponsible persons, and by reason thereof the bank became unsound, and the supervisor of banking of the state of Washington took charge for the purpose of liquidating the affairs of the bank. * * * "

While the answer further alleged that the directors and other officers of the bank had no actual knowledge that the funds of the bank had been misappropriated and embezzled by the cashier, and had no actual knowledge that the bank had become unsound or in an unsafe condition to continue business, I am of the opinion that the evidence shows the contrary of the latter allegations respecting the knowledge that the other officers of the bank either actually had or should have had. The special deputy supervisor of banking of the state of Washington, in charge of the liquidation of the affairs of this bank, testified, among other things, that:

"The capital of the bank was $25,000, and its surplus was claimed to be $25,000, and in my opinion Mr. Stewart abstracted from the bank a larger sum of money in assets than its entire capital stock and surplus. * * * The abstraction of assets from the bank by Stewart ran as far back as 1913, and probably before that. It was a sort of a case of robbing Peter to pay Paul. The first abstraction that we have discovered was a case wherein Mr. Stewart put some notes in the bank, apparently his own, and credited an estate of which he was administrator. We were not able to determine why he credited the estate, but we assume that he had used the money of the estate and was replacing it. He probably replaced that note with something else at a later date. That was quite frequently done; that some of the paper that he was directly or indirectly responsible for would be paid by the substitution of something else which he was still responsible for in some form or other, and that condition obtained for a long time."

The evidence shows that as early as December 13, 1920, the deputy bank commissioner of the state of Washington notified the cashier, Stewart, that a large amount of paper which the bank was carrying would have to be charged off or collected at once, closing his letter as follows:

"You are instructed that it will be improper for you to pay any dividends until permission has been given by this department. It will not be satisfactory for you to accept renewals in lieu of payment of any of the above items, and we cannot allow you to substitute notes therefor. The collections must actually be made. The above instructions have been given only after the most careful consideration of the report of examination and of the events which occurred during the time the writer was in your bank at the time of the examination. I recall your statements with respect to many of the items listed above, and believe that you feel that some of them are too severely criticized. I am frank to say, however, that I am convinced you are misleading yourself, and that before the entire matter is cleaned up your bank will have suffered a severe loss. You will consider the above instructions as definite. You will report to this department not later than December 31, 1920, showing what progress you have made toward complying with these instructions.

You will report again not later than March 15, 1921. Your failure to show proper progress can only result in a special examination being made of your bank, in order that we may determine what will be the proper course to pursue toward eliminating the objectionable items. Please acknowledge receipt of this letter."

In a previous report of the bank examiner, which enumerated loans aggregating $114,041.15, the examiner said: "In other words, $114,-041.15 of this bank's loans (total loans, $362,406.41) are subject to very severe criticism"—which condition of the bank, the record shows, was called, not only to the attention of the Cashier Stewart, but to that of Mr. Wallace, one of its directors. The record further shows that the bank commissioner subsequently called a meeting of the officers and directors of the bank for March 6, 1921, at Chehalis, Wash., at which meeting were present the president of the bank, Carothers, its assistant cashier, Plamonden, and one of its directors, Mr. George Marsh. At that meeting the bank commissioner, according to the record, called their attention to the condition of their bank, and notified them that an assessment on its capital stock would be levied immediately, which was done the next day, the assessment being 100 per cent. Following that meeting and assessment, the president, cashier, assistant cashier, and Plamonden's brother made an examination of the assets of the bank, which examination was completed the night of March 13th, and a report of the same, signed by Plamonden's brother, sent to the bank commissioner under date of March 14, 1921, in which it was stated:

"Nearly all of the paper in his cases can be classified as petrified assets, very little liquid, and the larger part valueless. I cannot see how it can ever be worked out as matters now stand, unless Mr. Stewart is able to pay a large part of his liability in cash and thus reduce the loans to a point justified by the deposits. I calculate Mr. Stewart's liability as follows:

| | |
|---|---|
| Notes to bank as maker and endorser......................... | $20,352.40 |
| Amount necessary to redeem stock now held by First National of Portland as collateral ....................... | 14,000.00 |
| 100 per cent. assessment on 124⅔ shares...................... | 12,466.67 |
| Special guaranty on notes ................................. | 50,000.00 |
| | $90,819.07 |

"It will be absolutely out of the question in my mind for the reorganizers to take that much of Stewart's paper, even though it be fully secured, for we shall find ourselves in the same condition as the bank now is, as to reserves, in a very short time, and therefore stiff pressure must be brought to bear on Stewart to get some money and at least reduce his liability to $50,000 of well-secured stuff. Should Stewart be able to do this, then I believe the bank will be solvent, though yet petrified to a somewhat lesser extent (sort of a semipetrification, may I say), but in a condition that can in the course of a year or two be worked out without loss to depositors or shareholders. At the present time I do not see anything to sell."

The evening of March 14, 1921, the assistant cashier of the bank wrote to the bank commissioner of the state of Washington, saying that he and the bank's president (Carothers) had been that evening conferring over the situation and had decided to call upon him for assistance and advice, and saying:

"Now, the key to the difficulty seems to us to be Mr. Stewart. He apparently has made no effort whatsoever to arrange his part of the solution, except that we believe he is planning to go to California at an early date. He

seems to have the idea in his head that we will accept his paper on guaranty for the $96,000 listed in L. N.'s letter. You can readily see that it would be impossible to do this. Mr. Carothers and I have mutually agreed to ask you to make a trip down, so that you and L. N. Plamondon, Mr. Carothers, Mr. Stewart, and myself can have a night conference and thresh the thing out. You could get here on the train that arrives at 8:20, and we could get busy the same night. You can 'phone me, or, better yet, 'phone Lou at Woodland and say when. The sooner the better."

Stewart had a short time before, according to the record, made an unsuccessful effort to get a New York bank to rediscount some of this bank's paper.

From what has been above stated, I think it clear that the president, the assistant cashier, and at least one of the other directors of this bank had, on and prior to March 14, 1921, actual knowledge that it was hopelessly insolvent and that all of its directors are properly chargeable with that knowledge.

"Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." Martin v. Webb, 110 U. S. 7, 15, 3 Sup. Ct. 428, 28 L. Ed. 49.

See, also, State v. Welty, 65 Wash. 244, 118 Pac. 9; Raynor et al. v. Scandinavian-American Bank et al. (Wash.) 210 Pac. 499, and the numerous cases there referred to.

The facts upon which Judge Gray, in the case of Quin v. Earle (C. C.) 95 Fed. 728, based his conclusion that the bank there under consideration should not be held guilty of fraud in receiving the deposit there in question when insolvent, are thus stated in his opinion (page 733):

"The most important evidence in this case as to the facts upon which the allegation of fraud is founded is given by Mr. Stotesbury, a member of the firm of Drexel & Co., and introduced by the complainant. This evidence, I think, is fairly summarized by defendant's counsel as follows: That on December 22, 1897, through the efforts of his firm, a plan had been devised for the reorganization of the Philadelphia Record Company, by which $643,000 out of a total indebtedness of $817,000 due by Mr. Singerly to the bank was to be paid in cash on the morning of December 23, 1897, and that so confident was he of the success of the plan that his firm advanced $125,000 to the bank on the 21st or 22d of December, in cash, to carry it through the clearing house on the morning of December 23, 1897, when it was expected this payment of $643,000 would come to the bank as a payment from Mr. Singerly, and to carry the bank over December 22d, when a committee, on the evening of that day, were to examine the trust company's books. Mr. Stotesbury admitted that the payment of the indebtedness of Mr. Singerly to the bank would make the bank solvent. William C. Smith, receiving teller of the bank, introduced by the complainant, testified on cross-examination, on page 20 of the examination of December 2, 1898, as follows: 'Q. Did Mr. Singerly say to you anything on the day before the suspension as to there being any doubt as to its (the bank's) opening the next day? A. During the day before the bank closed, I had every assurance that the bank would be in funds to meet all demands. Q. Who gave you that assurance? A. The cashier. Q. Mr. Steele?

A. Cashier William Steele. Q. Did he state the grounds for this assurance? A. He said that the terms had been agreed to by the syndicate to take up Mr. Singerly's liabilities, and furnish cash to enable the bank to go on. Q. How late in the day of the 22d did you have these assurances from the cashier? A. Well, before 3 o'clock. I think, again after 3 o'clock.' The committee to examine the books of the trust company met on the evening of the 22d, and the result of their examination was such as to cause them to advise the syndicate against going on with the negotiations. They so informed Mr. Singerly, who was present. This was between 10 and 11 o'clock of the evening of December 22d. Mr. Singerly then turned to Mr. Hardt, the bank examiner, and said, 'This means, Mr. Hardt, that you will have to take charge of the bank to-morrow morning.' I cannot see in all this that Mr. Singerly as president of the bank, was not, up to the hour named, making a bona fide and hopeful struggle to extricate the bank from its difficulties. That he, as men in such straits are apt to be, was oversanguine, does not matter, if the hope really existed, on the grounds here disclosed, at the time the deposit was received. The evidence of Mr. Stotesbury certainly shows that Mr. Singerly had powerful friends, and that a syndicate of ample financial strength had been actually formed to put him in a position to relieve the bank of its embarrassment. I do not think that a fraudulent purpose in receiving the deposit of complainant should be necessarily attributed to him because he did not, under the circumstances, abandon hope of assistance from that source until 10 or 11 o'clock of the evening of that day."

The difference in the facts of the case last referred to and the present one is most obvious. In the present case the president and other officers of the bank knew, prior to the deposit in question, that the assessment that had been levied on the stock of its dishonest cashier had not been and would not be paid, and that upon its payment the continuance of the business of the bank depended, and must have known that the speedy examination by the state bank commissioner, that had been asked for, would necessarily result in the closing of the bank. Both the receipt given by the Portland bank and the testimony of its vice president shows, in my opinion, that the warrants left in its possession were held as security for the deposits of funds of Cowlitz county, authority for which is given by section 5073 of Remington's Code (1915) of the state of Washington.

The record shows that the deposit made by the county treasurer March 14th was $35,337.57, of which $33,491.59 was used by the cashier in retaking the warrants from the Portland bank (and subsequently leaving them there for the purpose stated), leaving $1,845.98 of the money deposited by the treasurer of Cowlitz county March 14th in the Kelso bank at the time it was closed. For both that amount and the warrants I think the appellants were entitled to judgment, with costs.