**CRONKLETON v. EBMEIER.**

No. 8614.

Circuit Court of Appeals, Eighth Circuit.

Jan. 16, 1930.

H. D. Addison, of Wayne, Neb. (Fred S. Berry, of Wayne, Neb., on the brief), for appellant.

Herbert A. Welch and H. E. Siman, both of Wayne, Neb. (Davis & Welch, of Wayne, Neb., and Hackney & Welch, of Kansas City, Mo., on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and REEVES, District Judge.

KENYON, Circuit Judge.

Appellee on May 9, 1927, sold certain live stock in Omaha, Neb., the proceeds of which amounted to $7,642.52. He instructed the Commission Company to send the same to the Laurel National Bank of Laurel, Neb. The Commission Company deposited the money about noon of May 9, 1927, in the Stockyards National Bank of South Omaha, with instructions to transmit the same to the Laurel National Bank to the credit of appellee. The Stockyards National Bank sent a deposit ticket to the Laurel National Bank, and called up the Peters National Bank at Omaha, which was the correspondent bank of the Laurel National Bank, and advised them of the deposit, which was accepted by it. The Peters National Bank on May 9th sent a deposit slip to the Laurel National Bank, crediting it with this money. On May 10, 1927, appellee received a deposit slip from the Laurel National Bank covering the proceeds of the stock shipment. The board of directors of the Laurel National

Bank, on the afternoon of May 10th, closed the same, and it never opened thereafter. Appellee was overdrawn on May 10th, and on that date checked out various sums. He had a balance in the bank at the time of closing of $5,714.10. This suit is to establish said sum as a preferred claim against appellant, the receiver of the Laurel Bank. We think it unimportant as to whether the deposit from the proceeds of the sale of these cattle was made on the afternoon of May 10th, as found by the court, or on May 9th, for the condition of the bank was the same as to insolvency on both dates. The real questions involved are: (a) Was the Laurel National Bank insolvent on May 9 and 10, 1927? (b) Did the managing officers and directors of the same at the time of the deposit in question know that said bank was insolvent?

On the question of the solvency of the bank at the time of the deposit, the court said:

"That the bank actually was insolvent cannot be disputed in the light of the subsequent liquidation; the indications being that about thirty, and not possibly more than forty, cents on the dollar will be realized for depositors. * * *

"The situation then is that the bank was insolvent and could only pay thirty cents on the dollar; that the bank examiner knew it as soon as he checked it over in May, 1927, and so did the receiver as soon as he came in: that the officers knew there were some losses not reflected on the statement; that as to many large loans the officers knew they could not be realized within any reasonable time, if ever: that the real estate consisted of stale old equities with which they had long and vainly struggled and that no showing should be made to the Federal Reserve Bank to get a loan from that institution."

A national bank examiner made a report to the Comptroller of the Currency of the condition of this bank on February 2, 1927. This report showed over $84,000 of overdue paper, $95,000 of real estate securities taken for debts previously contracted, $49,000 on which real estate security had been taken in violation of law. Under the heading "Criticisms" the examiner's report shows:

#### "Slow and Doubtful Paper"

"Staggering amount carried. Liquidation practically depends upon ability of directors to move literally and in frequent instances, heavily encumbered farm property. Unless this can be done a heavy loss will result to the bank."

Then under the heading "Other Real Estate Owned":

"Frozen and undesirable. Two parcels carried over statutory limit. A 100% value or more of property tied up here. It is feared a substantial loss will be had herein before elimination can be had."

After the Comptroller of the Currency received said report, he, on or about April 6, 1927, wrote the directors of the Laurel National Bank criticizing the condition of the bank, and notified them to make an assessment of 10 per cent. against the stock to make good the impairment of capital. The bank officers replied that the assessment could not possibly be made, as the holders of a large part of the stock could not pay it. They were then notified by letter from the Deputy Comptroller, under date of April 30, 1927, that, unless the impairment was made good within ninety days, a receiver might be appointed. There had been a shrinkage of deposits of over $77,000 in two months shortly before the closing of the bank. No further credit would be extended by the Federal Reserve Bank. The officers and directors owed the Bank $22,000, and were liable as guarantors for over $15,000. After the receiver took possession, he made a report to the Comptroller of the Currency, which showed, in the recapitulation of assets, bills receivable, $557,536.08, of which $169,751.72 were good; $241,613.95 were doubtful, and $146,170.41 were worthless. The money on deposit in the bank subject to check was $158,854.84; public money on deposit was $37,870.26; the savings accounts were $14,487.32; time deposits $289,541.48, showing a liability to depositors of over $500,000.

By September 26, 1928, the receiver had collected:

| | |
|---|---|
| From bills receivable listed as good | $131,399.22 |
| From those listed as doubtful | 59,781.12 |
| From those listed as worthless | 20,828.79 |
| Making a total collection from the notes of | $212,009.13 |
| From other assets he had collected | 43,348.00 |
| Making a total collected of | $255,357.13 |

He also collected from the stockholders on their liability ......$17,894.72

He paid a 20 per cent. dividend, and had $64,000 cash at the time of his testimony. It is possible that some slight amount might be realized out of the remaining assets, but it is safe to assume that every available asset had been drawn on. It is apparent that the assets of the bank on May 9th and 10th were not nearly sufficient to meet the bank's obligations.

The rule as to when a bank is insolvent is well stated in 7 Corpus Juris, 727, as follows: "A bank is solvent when it has enough assets to pay, within a reasonable time, all of its liabilities through its own agencies, and is insolvent when unable to meet its liabilities as they become due in the ordinary course of business, or, in shorter terms, when it cannot pay its deposits on demand in accordance with its promise." In State v. Childers, 202 Iowa, 1377, 212 N. W. 63, 64, the court said: "The question is not whether the assets of the parties, together with the assets of the entity, are of sufficient value to ultimately satisfy the claims of creditors in full. It is the settled rule in this state, as well as in other jurisdictions, that a bank is insolvent when it is unable to pay its depositors and other creditors in the usual and ordinary course of business." See, also, Andrew, Superintendent of Banking v. Citizens' State Bank of Goldfield (Iowa) 221 N. W. 954; People v. Dubia, 289 Ill. 276, 124 N. E. 537; Steele v. Allen, Commissioner of Banks, 240 Mass. 394, 134 N. E. 401, 20 A. L. R. 1203. A bank might be insolvent but able to meet its obligations for a day or so out of the deposits and keep going, but it would not go far if it relied solely on increased deposits, which would merely create additional liabilities. Hope and expectation, while valuable, will not satisfy depositors if they desire their money. The mere fact that at some time in the future some of the assets may possibly be made available and the debts paid is not sufficient to show that the bank is solvent. Payment of depositors and creditors in the usual and ordinary course of business cannot be passed by as a controlling factor in determining the solvency of a bank. Whether or not a bank is insolvent is, of course, a question of fact. The court found this bank was insolvent when the deposit in question was received. There is sufficient evidence on which to base such an opinion.

Did the officers of the bank have knowledge that it was insolvent at the time the deposit was received?

Two cases relied on by appellant are Quin v. Earle (C. C.) 95 F. 728, and Fidelity & Deposit Co. of Maryland et al. v. Kelso State Bank et al. (C. C. A.) 287 F. 828. In Quin v. Earle, supra, the court laid down the rule on page 732 of 95 F., as follows: "The law applicable to the facts thus ascertained is well settled, and is not disputed in this case. If the president and officers of the bank knew or believed that the bank was hopelessly and irretrievably insolvent at the time of receiving the deposit of the complainant, then a fraud was undoubtedly committed by the bank upon the complainant, for which there should be a remedy. But fraud must be proved, and is not to be presumed, and the burden of proof is on the complainant. The mere fact that the bank was in an embarrassed condition, by reason of the large indebtedness to it from its president, is not sufficient of itself to establish the fraud alleged in this case." In Fidelity & Deposit Co. of Maryland et al. v. Kelso State Bank et al. (C. C. A.) 287 F. 828, the court on page 829 said (Judge Ross dissenting): "The burden of proof was upon the appellants to show that real fraud was practiced upon the depositor to whose rights they became subrogated. To do this they were required to show affirmatively both that the bank was actually insolvent when it received the deposits and that its managing officers then knew this to be the fact." These cases do not, of course, hold that knowledge on the part of the officers of the condition of the bank must be shown by the testimony of the officers. Such doctrine would put a premium on negligence. The circumstances may be such as to show that the officers must have known of the bank's condition. That is not presuming fraud. Unquestionably there is some responsibility on the officers and directors of a bank to know its financial condition.

As said in Richardson v. Denegre et al. (C. C. A.) 93 F. 572, 574: "The officers were where they could have known, they should have known, and must have known its actual condition." The Supreme Court of the United States in Martin v. Webb, 110 U. S. 7, 3 S. Ct. 428, 433, 28 L. Ed. 49, said: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed

to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." State v. Quackenbush, 98 Minn. 515, 108 N. W. 953; Tate, Treasurer, v. Bates, 118 N. C. 287, 24 S. E. 482, 54 Am. St. Rep. 719; Johnson v. Larson et al., 177 Minn. 60, 224 N. W. 466. This court in Scharnberg v. Citizens' National Bank (C. C. A. Iowa) 33 F.(2d) 673, reviewed to some extent Quin v. Earle, supra, and Fidelity & Deposit Co. v. Kelso State Bank, supra, and held that it must be shown that the officers of the borrowing bank knew that it must be insolvent. The trial court there had found that the officers did not know the bank was insolvent, and this court sustained the finding. Here the trial court found that the bank was insolvent. There all that was proved was that the officers of the borrowing bank knew the bank was financially embarrassed, and that they did not know it was insolvent, and the fact that they were attempting to borrow from the Federal Reserve Bank was considered strong evidence they did not know of the bank's insolvency. Here there is nothing of that kind.

It is urged that, because Mr. Wilson, the president of the Laurel Bank, went to St. Paul and endeavored to secure $40,000 from friends upon his own personal resources to put into the bank, he could not have known of the bank's condition—that he would not have dumped $40,000 into an insolvent institution. His evidence shows that he did not really expect to get the money, but hoped to. The fact that the cashier of the bank was on May 9th attempting to discount some notes of the bank in Omaha is urged also as a circumstance to show the officers of the bank did not know of its insolvency. Both of these incidents, of course, bear upon the question, but are not sufficient to overcome the strong inference arising from the evidence that the officers must have known the bank was insolvent. The trial court weighed all this evidence, and its conclusion should not lightly be set aside. If the officers of the bank believed it was solvent on May 9th or 10th, it was because they would not face the truth, and preferred to continue living in a fool's paradise. Can it be that the officers of a bank may close their eyes and ears to the true situation, permit their names to be used to influence people to deposit moneys in the bank, and not be held in a civil action to knowledge of the condition of the bank. That is not common honesty or common sense. Taking people's money as deposits in a bank is a serious business, and those who do so should be held to a high degree of responsibility in honesty and good faith. If it is apparent to officers of a bank that its condition is such that there is no possibility of paying back a deposit in the ordinary and usual course of business, it is a fraud to accept the same. As Judge Woodrough (trial judge) says in his opinion: "It was a palpable wrong to take the plaintiff's money, under the circumstances on the very day of liquidation, and the flimsy reasons for groundless belief in the validity of the assets which were given by the bank officers ought not to force the judge of this court to be the only government officer blind to the fact. I am satisfied that the bank officers in giving their testimony that they thought the bank was solvent have simply let their desperate hopes crowd out their actual thoughts from their recollections. That in fact they knew the bank was insolvent by the same tokens that the examiner and the receiver knew it and as the fact is now manifest to all the world."

The judgment of the trial court was right, and it is affirmed.