[No. 12513.    Department One.    December 1, 1915.]

JOHN S. SHEDDEN, *Respondent*, v. T. HARRY SYLVESTER
et al., *Appellants*.[1]

VENUE—LOCAL ACTIONS—CHANGE OF VENUE—JURISDICTION. Where
a local action (to foreclose a mortgage) is brought in the proper
county, and a change of venue had upon stipulation for the conven-
ience of witnesses, the court to which the case is transferred has
jurisdiction to enter the judgment.

MORTGAGES—FORECLOSURE—DEFENSES — WANT OF CONSIDERATION—
EQUITY. Equity will deny the foreclosure of a mortgage, at the suit
of one claiming to be a holder of the note for value, where it appears
that promoters of an irrigation scheme caused the corporation un-
der their control to execute the notes, secured by mortgage, to the
principal stockholder, without consideration, and for ulterior pur-
poses, which were afterwards consummated, the holder of the notes
having no other interest than that of trustee to protect the pro-
moters in the pretense that there was a valid lien upon the pump-
ing plants, and that, after failure of the enterprise and insolvency
of the corporation, the promoters induced the stockholders to ad-
vance large sums to pay debts, cancelled half of the debt, and in-
stead of holding the balance and attempting to collect it, transferred
it at the first opportunity to one having no interest in it, and who
had full knowledge of the affair.

Appeal from a judgment of the superior court for Yakima
county, Grady, J., entered May 20, 1914, upon findings in
favor of the plaintiff, in an action to foreclose a mortgage,
tried to the court.    Reversed.

*Van Nuys & Hunter*, for appellant Co-Operative Orchards
Company.

*Edward V. Lockhart*, for respondent.

CHADWICK, J.—The first question presented in this case is
one of jurisdiction.    The action was brought to foreclose a
mortgage upon real property in Benton county.    When the
issues had been made up, the parties stipulated that the case
be transferred to the county of Yakima, the ground for the
change being to serve the convenience of witnesses.

[1]Reported in 153 Pac. 1.

After the case had been transferred to Yakima county and a decree entered, the attorneys who had appeared for the defendant withdrew from the case and present counsel were substituted. An objection was then made to the jurisdiction of the court. This was overruled.

It is contended that, under the decisions of this court, *McMaster v. Advance Thresher Co.*, 10 Wash. 147, 38 Pac. 670; *Hammel v. Fidelity Aid Ass'n*, 42 Wash. 448, 85 Pac. 35; *West v. Martin*, 47 Wash. 417, 92 Pac. 334; *Whitman County v. United States Fidelity & Guaranty Co.*, 49 Wash. 150, 94 Pac. 906; *Richman v. Wenaha Co.*, 74 Wash. 370, 133 Pac. 467, the court had no jurisdiction to enter the decree. We think that counsel are inclined to give to the decisions relied on a meaning they will not bear. It is true that a local action must be begun in the proper county, and if it is not so begun, a court will, as directed by statute, transfer it to the proper county. This court has also held that, if a judgment be taken in the wrong county, either by default or over the protest of a defendant, it is taken without jurisdiction and will be set aside upon direct attack.

The statute fixing the venue of an action must be construed with reference to all other statutes affecting procedure. In *State ex rel. Howell v. Superior Court*, 82 Wash. 356, 144 Pac. 291, this court conceded, for the sake of argument, that the action there sought to be controlled by mandamus was local to King county, but held that the court was not without power to change the venue to Chelan county, where the convenience of witnesses and the ends of justice demanded such change, saying:

"It is plain from these provisions [§§ 209, 215] of the statute that, where these causes exist (being causes of a change of venue) in either a local or transitory action, the change may be made; and the statute expressly provides that the cause shall be tried in the county to which the change is made. That court necessarily must have jurisdiction of the case."

One Forsyth was the owner of certain arid lands in Benton county, upon which were two pumping plants.  Respondent introduced one Sylvester to him as a prospective purchaser of his property.  After some negotiation, Sylvester took an option upon the land at $180 an acre.  This included the pumping plants.  It was Sylvester's purpose to sell the land to parties in the east.  This he did by making contracts of sale, taking in payment $75 in cash and promises to pay the balance in installments.

Sylvester formed a corporation called the River Front Power & Irrigation Company, and caused the title to the two pumping plants to be conveyed to the corporation.  He also contracted with the several purchasers of the subdivided tracts to pay $75 an acre per year for four years for planting, irrigating and caring for the tracts until the trees to be planted thereon came to maturity.  He caused to be executed a note for $6,000 (Nov. 30, 1909) upon one plant, and $4,000 (Feby. 11, 1910) upon the other, each to Forsyth.  It is now insisted that Sylvester was the owner of one-half of each note and respondent the owner of one-half of each note, respondent's interest being, therefore, $5,000, which it is contended was to be paid him as a commission for introducing Sylvester to the owner of the land.  The $6,000 was secured by a mortgage of even date.  The River Front Power & Irrigation Company had no funds and defaulted in their obligation to the buyers of the tracts.

On December 14, 1910, the River Front Power & Irrigation Company executed a mortgage for $10,000 to Forsyth to secure both notes.  After notice of the situation had been brought home to the purchasers, they met Forsyth and Sylvester in New Jersey in January, 1911.  After taking account of the bad affairs of the scheme, a voluntary credit was made upon the contracts of purchase of so much an acre. The title to the two pumping plants were conveyed to another corporation, The Co-operative Orchards Company, a cor-

poration formed by those who had purchased lands from Sylvester.

The notes of six and four thousand dollars had been made payable to, and it is said that they were to be held by, Forsyth, the owner of the land, as trustee of the parties mentioned. At the meeting in the east, Forsyth voluntarily cancelled and surrendered the note for $4,000 and caused a credit to be made of $1,000 upon the $6,000 note. Whereupon, the owners, acting through their corporation, agreed to pay, and did pay, other debts aggregating some $15,000, and agreed to settle with the respondent.

We think it is clear that Forsyth, the original owner of the property, who held the note as a trustee for the corporation, gave assurance to the eastern people that the Shedden note could be settled for an inconsequential sum.

Almost immediately after the meeting in the east, Forsyth assigned to respondent the $6,000 note and the $10,000 mortgage. Respondent soon thereafter demanded payment of the note in full. After considerable correspondence, the Co-operative Orchards Company agreed that it would pay respondent $1,000 down and $100 each month thereafter. Under this agreement the company paid $2,138.96, together with interest up to October 1, 1912.

This action is brought as an ordinary suit in foreclosure. The defenses which are material at this time are that there was no consideration for the $6,000 note and the $10,000 mortgage; that the mortgages were given to secure a purchase price, and all sums due and owing on account of the cost of the pumping plant, either in law or in equity, had been discharged by the issuance of stock in the River Front Power & Irrigation Company to Forsyth; that fraud was practiced upon the individuals who formed themselves into appellant corporation by concealing the true facts; that such fraud was not discovered until after the payments had been made under the subsequent agreement to pay, and when dis-

covered, that it refused to pay further, and finally, that respondent is not a purchaser for value.

We have found this case to be one of exceeding difficulty, for it cannot be denied that respondent has a paper case which has been sustained by the findings and decree of the trial judge. We think the only question available to appellant is whether the $6,000 note was a valid, subsisting indebtedness at the time appellant took title to the pumping plants and agreed to pay certain existing debts against the Power & Irrigation Company held by Forsyth and others. In other words, was there at the time, or had there been, a consideration for the mortgage?

Taking the case by its four corners, we are satisfied that the withholding of title to the power tracts and the contracts permitting the water users to eventually purchase them at the sum of $6,000 and $4,000 respectively, and the giving of the notes, was clearly a manipulation on the part of Forsyth and Sylvester in which respondent had either no interest, or a knowledge of all that was done.

Forsyth, to whom the mortgage and notes were made, is not at all clear in his testimony. Any one of several findings might be made from it. It might be found that he was a trustee for Shedden and Sylvester, or it might be found that the mortgage and notes had been executed to him for the purchase price; that the minutes of the corporation show that a meeting was called to issue stock for the purchase price; that the stock was issued in Forsyth's name, or that he took them to protect himself and keep the whole thing in his own hands.

It may be that Forsyth had an original purpose to protect himself when he took the two notes and the $10,000 mortgage in his own name, but it is not likely. In fact the conclusion seems to be compelling that he had no other interest than that of a trustee to protect Sylvester in a purpose which was ultimately consummated; that is, to sell the pumping plants at his own price under the pretense that there was a

valid lien upon them. The fact that Sylvester never treated the mortgage as a lien as between the parties, and the further fact that Forsyth, in a letter of date January 28, 1910, disclaimed all interest in the enterprise, casts a fog of uncertainty and doubt over their testimony and tends to impugn the whole transaction.

Taking the case of Sylvester: He was the purchaser of the whole enterprise, including the pumping plants. His corporation, with the exception of five shares sold to a man named Benny and one share given to a man named Kramer, so as to have three incorporators, was Sylvester. He was its dominating spirit and controlled it. With the legal title in his hands, or so completely under his control, it were folly to make a mortgage to himself or to his own trustee unless it was to serve some ulterior purpose. If it were done to protect the payments to Sylvester for the purchase price, and respondent for his commission, the testimony does not ring true, for that would leave Forsyth security for only half of the purchase price, according to the testimony of all the witnesses.

We think the truth is clear that the $4,000 note and the $6,000 note represented the pretended purchase price for the two tracts from Forsyth, and that the $10,000 mortgage was put on with intent to save something to Sylvester out of the wreck, after it had become apparent that Sylvester's side corporation was insolvent and could not carry out its agreements, and when it was certain that its negligence had caused the purchasers of the subdivided tracts great loss. It may be that Sylvester, or Forsyth—they are all mixed up in their account of the transaction—had promised to pay respondent a commission for introducing him to Forsyth—in one place Forsyth's testimony will bear the construction that something was due from him as a commission for other services and work—but that respondent had any interest in the notes at the time they were executed, we do not believe.

When Forsyth and Sylvester were in the east and consulting with the stricken stockholders, who seemed to have had faith in them, it was represented to appellant that respondent owned the $6,000 note after the indorsement of the $1,-000; that it was a valid subsisting lien. Forsyth was respondent's trustee holding the note. He had personal claims of great amount against the purchasers, or rather against the scheme. He was interested in collecting his own, and he did. As an inducement to a statement that made him whole on his unsecured claims, he admits that he represented to them, when asked if he did not say that respondent would take a nominal sum and that he would probably be liberal in his settlement, that,

"I didn't say that exactly, or that in substance; I did tell them that I believed they could get a very satisfactory settlement out of Mr. Shedden by offering him a gross sum to be paid speedily, because Shedden needed the money; I advanced the further idea that Shedden had received very large compensation for the service he had rendered and that would probably put him in a humor to be more liberal on the amount; I didn't specify any exact sum that I thought he would take."

He held both notes at the time, but discovered only one of them, $4,000, which was cancelled because, as we believe, it would not stand the light of equity, but concealed the $6,-000 note under the pretense that respondent had a real interest in it; that it was given to pay his commission, although we have no doubt that he had as much authority to cancel the one as the other of the notes and that it was his duty to do so. At any rate, instead of holding the note and undertaking to collect it, as he was in moral right bound to do, he transferred the note at the first opportunity to respondent, who set about to coerce the payment of it in full.

If, as we have found, respondent had no real interest in the note, and it was given either to secure Forsyth for the purchase price which had been paid in stock, or to fix an apparent value under which the buyers of the tracts could not

go if they exercised their option to organize a corporation among themselves to purchase the water plants, it follows that a transfer of the note to respondent was without consideration and he cannot recover. He knew all the facts and is not a purchaser in good faith.

Appellant contends that it should recover the sum voluntarily paid under a misunderstanding of the facts. To sustain such a recovery we would have to find that the payments were coerced. The testimony is hardly sufficient to sustain that finding. The buyers and the officers of the appellant seem to have misplaced their trust, but they were not coerced in a legal sense. As much as they can claim is that the mortgage be discharged as a lien for the balance due at the time it was repudiated.

Respondent, and those operating for and with him, seem to have deliberately set about to make a paper case, but when this is measured in the light of equity, we are compelled to find that there was no consideration for the note sued on, or if so, that it was discharged and that the mortgage was a pretense, and that respondent holds nothing that is enforceable as a lien against the present owners of the legal title to the property.

Reversed and remanded with instructions to enter a decree upon the facts in favor of the appellant.

MORRIS, C. J., FULLERTON, MOUNT, and MAIN, JJ., concur.