[No. 20951. Department One. April 4, 1928.]

NORTH BEND LUMBER COMPANY, *Respondent*, v. THE CITY OF SEATTLE, *Appellant*.[1]

[1] VENUE (10) — LOCAL ACTIONS — CHANGE OF VENUE — POWER OF COURT. Under Rem. Comp. Stat., §§ 209, 215, a court has power to grant a change of venue in a local action, primarily triable in the home county of defendant, where, due to local prejudice, the demands of justice justify the change.

[2] VENUE (14, 19)—CHANGE—GROUNDS—LOCAL PREJUDICE—DISCRETION OF COURT. Under Rem. Comp. Stat., § 209, subd. 2, authorizing a change of venue where it appears that an impartial trial cannot be had in the proper county, the court is warranted in granting a change in an action against a city therein, owing to local prejudice in favor of the city.

[3] WATERS AND WATERCOURSES (79)—RESERVOIR—INJURIES FROM ESTABLISHMENT—EVIDENCE—ADMISSIBILITY. In an action for damages for negligently impounding the waters of a river, so as to impair the value of a saw mill plant, evidence is admissible to show the amount of timber available for lumber purposes, which the lumber company is prevented from utilizing.

[4] WATERS AND WATERCOURSES (79)—EVIDENCE (49)—RELEVANCY— EFFECT OF IMPOUNDING WATERS OF ADJACENT STREAM. In an action for damages for negligently impounding waters, evidence showing the porous character of a moraine separating another lake from the one supplying the reservoir is admissible for the purpose of showing that, in periods of high water, there was drainage from the adjacent lake, increasing the quantity of water in the lake supplying the reservoir.

[5] EVIDENCE (204)—OPINION EVIDENCE—VALUE OF REAL PROPERTY. In an action for damages for the impairment of mill property, the admission in evidence of an expert's written appraisal of the various items of value of the property was not error, where it was introduced in evidence as the testimony of the expert who made it.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered April 27, 1927, upon the verdict of a jury rendered in favor of the plaintiff, in an action in tort. Affirmed.

[1]Reported in 266 Pac. 156.

*Thomas J. L. Kennedy, Ray Dumett,* and *Arthur Schramm,* for appellant.

*Peters & Powell* and *Reames & Moore,* for respondent.

PARKER, J.—In May, 1919, the plaintiff lumber company commenced this action in the superior court for King county, seeking recovery of damages alleged to have been suffered by it as the result of the negligent action of the defendant city in impounding the waters of Cedar river for generating electric power. More particularly, the claimed damages are alleged to have resulted, in December, 1918, from the city raising the level of the impounded waters to such height that they were thereby caused to escape, through the northerly porous moraine barrier of the city's impounding reservoir, in such sudden flood quantities as to completely overwhelm and destroy the lumber company's mill plant, situated some three miles northerly from the city's reservoir on ground some eight hundred feet lower. The lumber company also, in two additional causes of action, sought recovery upon two assigned damage claims resulting from the same catastrophe.

In December, 1919, the case proceeded to trial in the superior court for King county, resulting in a verdict in favor of the city. Thereafter, the superior court granted to the lumber company a new trial. In August, 1921, upon the city's appeal, this court affirmed the superior court's order granting the new trial. *North Bend Lumber Co. v. Seattle,* 116 Wash. 500, 199 Pac. 988.

In September, 1925, the lumber company moved the superior court for King county for an order changing the place of the trial of the action to some other county, on the ground "that an impartial trial cannot be had in King county." In April, 1926, that motion, having

been heard upon numerous affidavits, was by the court granted, and an order entered accordingly transferring the case to Pierce county for trial in the superior court for that county. On January 4, 1927, the case proceeded to trial in the superior court for Pierce county and continued without interruption until March 14, 1927, when the jury returned a verdict awarding recovery to the lumber company on its first cause of action in the sum of $313,308.67; on its second cause of action in the sum of $2,475; on its third cause of action in the sum of $21,162.13; the second and third causes of action being the assigned claims. On April 27, 1927, the city's motion for new trial having been overruled, final judgment was rendered, awarding to the lumber company against the city recovery in accordance with the verdict of the jury. From this judgment of the superior court, the city has appealed to this court. The seemingly long delay in finally bringing the case to trial the second time was because of protracted negotiations and efforts looking to a compromise and settlement of the controversy.

The Cedar river runs generally in a northwesterly direction to a point some two miles below the city's dam, which was constructed to impound the waters of the river. At that point, the river having fallen some five hundred feet through the canyon below the dam, it turns abruptly to the southwest, there entering and following southwesterly a narrow valley which extends from that point to the northeast into the Snoqualmie river watershed, as well as to the southwest into the Cedar river watershed. The Snoqualmie river, some three miles northeast from the Cedar river, along the portion of the Cedar river's course in question, also runs generally in a northwesterly direction, roughly paralleling that portion of the Cedar river.

The apparent surface line dividing the watersheds

of these rivers crosses the narrow valley less than one-half mile northerly from where the Cedar river turns to the southwest in the valley; and runs thence easterly, irregularly up the hills, to a point a short distance northerly from the city's dam, and thence easterly along the glacial moraine approximately one mile to the base of Mt. Washington, which rises between the rivers to an altitude of some 4200 feet above sea level. This moraine divide is of considerable width and has an extreme elevation of approximately 1600 feet above sea level. Water finding its way into the moraine drains out therefrom, fully as much or more, northerly into the watershed of the Snoqualmie river as southerly into the watershed of the Cedar river. Indeed, the evidence warrants the conclusion that a considerable quantity of the water within the apparent Cedar river watershed, that is, south of the crest of the moraine, drains through the moraine into the Snoqualmie watershed.

Rattlesnake lake, a body of water about a mile long and one-quarter of a mile wide, lies in the narrow valley about one-half mile north of where the Cedar river turns to the southwest, the lake being in the watershed of the Snoqualmie river. A branch of Boxley creek flows out of the northerly end of the lake, and, about one mile northeasterly therefrom, uniting with another branch of that creek which rises on the northerly slope of the moraine about one mile east of the lake, flows on northerly into the Snoqualmie river some two and one-half miles distant from these respective sources.

The lumber company had constructed, maintained and operated, for many years prior to the catastrophe in question, its large well-equipped sawmill plant on Boxley creek, near where it empties into the Snoqualmie river. The mill plant of one of the lumber

company's assignees and the property of the other of the lumber company's assignees were similarly situated, and each was damaged by the catastrophe which damaged the lumber company's mill plant.

In the year 1914, the city commenced the construction of its concrete dam in the Cedar river, with a view of impounding the waters of that river to generate electric power. There was left a large opening in the foot of the dam, some twelve feet in diameter, to let the river freely flow through while construction work was progressing. The dam was ultimately built so that its crest was about 1600 feet above sea level, with a notch in its crest some thirty feet deep, with a view of ultimately regulating, if necessary, the level of the water when rising above the bottom of the notch.

In October, 1918, the city "plugged" the opening in the bottom of the dam and thereby commenced to raise the waters behind the dam in its reservoir. As the water rose behind the dam, the flow of water from the northerly slope of the moraine into the lake and the branches of Boxley creek increased. On December 23rd, 1918, the surface of the water in the reservoir behind the dam had reached approximately 1550 feet above sea level, and then occurred a large slide and washout on the northerly slope of the moraine above the source of the easterly branch of Boxley creek, reaching up to approximately 1500 feet above sea level, causing the release of a vast quantity of water, the sudden flooding of Boxley creek and the practically complete destruction of the mill plant of the lumber company and the property of its assignees, situated upon and near the creek some two miles down stream and some 700 feet lower. The case was prosecuted in behalf of the lumber company, resulting in the verdict and judgment awarding it recovery upon the theory, in substance, that the city negligently im-

pounded the waters of the Cedar river to the height they were so impounded without using proper precaution to ascertain that such impounding could be safely done, in view of the porous condition of the moraine constituting the northerly boundary of the reservoir, and that the flood waters, so suddenly turned loose in Boxley creek, were largely the impounded waters in the city's reservoir; and hence the city became liable for the damage so resulting to the lumber company and its assignees. This very general summary of facts is not made with any view of showing that the evidence supports the verdict and judgment, no contention here being made as to the sufficiency of the evidence to support the verdict and judgment; but is made to give a general view of the outstanding features of the controversy, to the end that the claims of error be more readily understood.

[1] It is contended by counsel for the city that the superior court for King county erred in granting the change of venue to Pierce county; it being first argued in that behalf, in substance, that the action is purely local to King county, and that therefore the superior court for Pierce county could not legally acquire jurisdiction to try the action. We may concede that the action is local, and not transitory, in the sense that it should have been commenced in King county, since the city, the only defendant, is in King county, the injuries to the properties of the lumber company and its assignees all occurred in King county, and all acts of the city complained of occurred in King county. This seems to have been recognized as the law in the following of our decisions, though we have no statute in express terms so providing with reference to actions against counties: *State ex rel. King County v. Superior Court*, 104 Wash. 268, 176 Pac. 352; *Howe v. Whitman County*, 120 Wash. 247, 206 Pac. 968, 212 Pac. 164.

But surely this action is, in no event, more purely local than is an action to foreclose a mortgage on real property local to the county in which the real property is situated; for, as to such action, it is expressly provided by Rem. Comp. Stat., § 204 [P. C. § 8541], that it "shall be commenced in the county in which the subject of the action, or some part thereof, is situated;" and it was squarely held in *Shedden v. Sylvester,* 88 Wash. 348, 153 Pac. 1, that the venue of an action to foreclose a mortgage on real property in Benton county, commenced in the superior court of that county, was lawfully changed to Yakima county so as to confer jurisdiction over the action upon the superior court for Yakima county. Answering the contention that the decree of the superior court for Yakima county was rendered without jurisdiction because of the action being local to Benton county, Judge Chadwick, speaking for the court, said:

"'The statute fixing the venue of an action must be construed with reference to all other statutes affecting procedure. In *State ex rel. Howell v. Superior Court,* 82 Wash. 356, 144 Pac. 291, this court conceded, for the sake of argument, that the action there sought to be controlled by mandamus was local to King county, but held that the court was not without power to change the venue to Chelan county, where the convenience of witnesses and the ends of justice demanded such change, saying:

" 'It is plain from these provisions [§§ 209, 215] of the statute that, where these causes exist (being causes of a change of venue) in either a local or transitory action, the change may be made; and the statute expressly provides that the cause shall be tried in the county to which the change is made. That court necessarily must have jurisdiction of the case.' "

In *State ex rel. Christensen v. Superior Court,* 108 Wash. 666, 185 Pac. 623, the jurisdiction of the superior court for Pierce county was sustained upon this same

theory, though the action in question in that pro-
hibition proceeding was local to King county. We do
not overlook the fact that the change of venue in
*Shedden v. Sylvester, supra,* was by express stipula-
tion of the parties; or the fact that in *State ex rel.
Christensen v. Superior Court,* the action in question
was commenced and tried upon the merits in Pierce
county, though local to King county, without any ob-
jection to the venue being made by either party, until
after the close of the trial, when final decree was about
to be rendered therein, when the jurisdiction of the
superior court for Pierce county was challenged by
the party about to become the loser, upon the ground
that the action was local to King county; thus pre-
senting a situation, in effect, showing, as was held by
the superior court and this court, a consent to the
venue in Pierce county by all parties to the action.

Now, a change of venue for trial of an action can
be lawfully made in pursuance of a showing of one or
more of the causes as prescribed by Rem. Comp. Stat.,
§ 209 [P. C. § 8545], as was done in the case before
us, or in pursuance of a stipulation of all parties, as
prescribed by Rem. Comp. Stat., § 216 [P. C. § 8551].
Manifestly, one of these methods is as effective as
the other in giving jurisdiction to the court to which
the change is made. It seems clear to us that the
superior court for Pierce county acquired jurisdiction
to proceed with the trial of this case and render final
judgment therein.

[2] It is contended by counsel for the city that, in
any event, the superior court for King county erred
in ordering the change of venue to Pierce county, in
that there was a failure to sufficiently show that an
impartial trial could not be had in King county, and
accordingly that court abused its discretion in so
changing the venue. The application for the change

of venue was made by the lumber company, exercising its right in that behalf, under subdivision 2 of the following provisions of Rem. Comp. Stat., § 209:

"The court may, on motion, in the following cases, change the place of trial, when it appears by affidavit or other satisfactory proof,—

"1. That the county designated in the complaint is not the proper county; or

"2. That there is reason to believe that an impartial trial cannot be had therein; or  . . . "

There were filed and presented to the court, both in support of and in opposition to the change of venue, a great number of affidavits touching the question of prejudice existing in the minds of the public in Seattle which contained, according to the United States census of 1920, 315,312 of the 389,273 inhabitants of King county; which proportion, it may be presumed, has remained approximately the same. The case had been tried once before in the superior court for King county and had become one of great notoriety, in which the public evidently had become much interested. A tentative compromise of the controversy was thereafter agreed upon by the lumber company and the city council, and by the council submitted to the voters of the city at a referendum election, for approval or rejection. The election held thereon resulted in a rejection of the tentative compromise settlement by a substantial majority. It appears, from the showing made to the court, that the payment of any substantial sum to the lumber company for the damage suffered by it and its assignees has been vigorously opposed by a great number, probably by a majority, of the people of Seattle.

The change of venue to Pierce county was not a matter of any great inconvenience to the city of Seattle in the trial of the action, in view of the fact that the

distance of the Pierce county courthouse from the King county courthouse is approximately only thirty miles, with abundant and easy facilities for travel between the two. There are numerous other considerations, though many of them, viewed separately, are of minor importance, pointing to the probability of the lumber company not being able to secure a fair trial in the superior court for King county, considering the matter, of course, wholly apart from the personnel of the judges of that court; and we see nothing in the record indicating that there existed the least public sentiment in Pierce county for or against either party to the action.

The question of change of venue, such as was presented to the superior court for King county, is not one that can be determined by any hard and fast rule. Each such question is largely a problem of its own, and hence it has been repeatedly held by the courts that the determination of such question is almost wholly one of discretion of the trial court called upon to decide it. Our decisions in *State v. Welty*, 65 Wash. 244, 118 Pac. 9; *Culbertson v. Gilbert Hunt Co.*, 79 Wash. 446, 140 Pac. 548, and *Leopold v. Livermore*, 115 Wash. 481, 197 Pac. 778, are in harmony with this view.

It is not so much a question for us to decide as an original one, whether or not the change of venue here involved should or should not have been granted. Our problem is to determine whether or not the superior court of King county abused its discretion in so granting the change of venue. We do not feel called upon to review or enumerate all of the numerous facts brought to the attention of the trial court, which might legitimately have a bearing upon the question. We deem it sufficient to say that, upon the record before us, we cannot decide that the King county superior court

abused its discretion in granting the change of venue. Indeed, in this particular case, we think it not inappropriate to say that we would be strongly inclined to affirm the action of the superior court for King county either in granting or refusing to grant the change of venue.

[3] It is contended in behalf of the city that the trial court erred to its prejudice in permitting witnesses for the lumber company to testify as to the large amount of standing timber which, from a practical, physical standpoint, would be available to be procured for sawing into lumber by the lumber company's mill plant, though it not being shown that the lumber company had acquired any ownership rights in the particular timber to which the testimony related. This proof was not introduced to show loss of prospective profits by the lumber company. Indeed, the lumber company made no claim whatever for loss of prospective profits by reason of the destruction of its plant. Its claim was only for loss of the value of its plant. This proof was only one item of evidence tending to show that the mill plant of the lumber company, located and well established there, was favorably situated as regards timber probably available for its operation. This evidence, it seems to us, may be likened to proof of an available market as a matter to be considered in determining the physical value of any industrial or mercantile plant. Surely, the physical value of an established industrial or mercantile plant would be affected by its favorable or unfavorable location, with reference to its acquiring material for manufacture and distribution, as well as a favorable or unfavorable location looking to the marketing of its product. It seems to us the objection to this evidence may be considered only as being directed to its weight, rather than to its relevancy to the value

of the lumber company's plant. We conclude that the court did not err in admitting this evidence.

[4] It is contended in behalf of the city that the trial court erred to the prejudice of the city in admitting evidence showing the variation in the quantity of water from time to time in Rattlesnake lake during previous years. The argument seems to be that such inquiry was foreign to the question of the damage caused by the sudden flooding of the waters of the easterly fork of Boxley creek, having its rise on the northerly slope of the moraine, approximately a mile east of the lake. The moraine extended westerly, so that Rattlesnake lake lay several hundred feet below the top of the moraine and received waters coming out of the moraine, as did the easterly fork of Boxley creek. There was evidence also tending to show that the water of Rattlesnake lake was influenced as to quantity by the rising and falling of the water of Cedar lake, which is a considerable widening of the Cedar river above the city's dam. There was testimony tending to show that the waters of Rattlesnake lake, the source of the westerly fork of Boxley creek, increased or diminished as the waters of Cedar lake increased and diminished. So, this evidence, it seems plain to us, had some bearing upon the question of the porous character of the moraine generally; there being evidence tending to show that waters flowing from the moraine to the north and northwesterly into Rattlesnake lake, the source of the westerly fork of Boxley creek and into the easterly fork of Boxley creek from the north slope of the moraine, came from territory that was within the apparent watershed of Cedar river; this because, viewing the surface topography of the moraine, its crest would seem to be the dividing line of the two watersheds. We see no error in the ad-

mission of the evidence touching the variation in the quantity of water in Rattlesnake lake.

[5]   Some six months prior to the commencement of the second trial, the lumber company employed the General Appraisal Company to make a detailed appraisement of its plant. One of the appraisal company's experienced employees, an expert in that line of work, accordingly made the appraisement, spending several weeks in so doing, putting a valuation upon the respective buildings and equipments constituting the plant, making allowance for depreciation and considering replacement costs. The typewritten appraisal so made by the expert was introduced in evidence in connection with his testimony. This is claimed as error prejudicial to the city. If the appraisement had been admitted as an independent item of evidence looking to the showing of the value of the plant, we would have quite a different problem here; but, as we view this record, the appraisement was, in effect, introduced in evidence as the testimony of the expert who made it; that is, as his testimony of his opinion of the value of the plant and its equipment. The question seems to us to be no different in its legal aspect than as if this expert witness had orally testified in detail as to his opinion of the value of each appraised building and piece of equipment. Indeed, such was the effect of his testimony, though he did not orally name each building and piece of equipment and specify the value thereof. We conclude that the admission of the appraisement under these circumstances was not error to the prejudice of the city.

Contention is made in behalf of the city that the trial court erred to its prejudice in giving a number of its instructions to the jury and in refusing to give to the jury certain instructions as requested by counsel for the city. We have carefully examined these numerous

claims of error. The instructions, as the case seemed to warrant, were quite voluminous. They covered the law, seemingly, of every possible phase of the problem confronting the jury. Some expressions therein may seem, when read apart, subject to some technical criticism; but, read as a whole, we are unable to see other than an unusually fair presentation of the applicable law to the jury. The requested instructions seem to us to have been fairly embodied in those given by the court, though not given in the exact language as requested. We conclude that there was no prejudicial error in giving or refusing instructions.

It is contended in behalf of the city that the trial court erred in refusing to order a mis-trial and discharge the jury at the conclusion of the introduction of the evidence, prior to the submission of the case to the jury, and also in overruling the city's motion for a new trial made after the rendering of the verdict by the jury. Apart from the questions already discussed by us, these motions were rested upon the charge, in substance, of misconduct, when the court was not in session, on the part of representatives of the lumber company looking to, and having the effect of, unduly influencing the jury and thus preventing the city from having a fair trial. The facts relied upon to support these charges and the denials thereof were brought to the attention of the court by some forty affidavits from each side. As we read these affidavits, we see little in those presented in behalf of the city other than bare suspicions of some wrongdoing of the nature charged, on the part of agents of the lumber company. All of the acts of any serious moment, so alleged, are denied by affidavits of seemingly equal credibility. To analyze these numerous and voluminous affidavits in this opinion would be of no profit to anyone. We deem it sufficient to say that we are clearly of the opinion that

we should not disturb the rulings of the trial court touching these charges. We deem it appropriate to here observe that none of the alleged charges of misconduct against agents of the lumber company reflects in the least to the discredit of counsel for the lumber company.

We are unable to see in this record any prejudicial error committed by either the superior court for King county or the superior court for Pierce county in the conduct of this case, after it was remanded for new trial by our decision reported in 116 Wash. 500, 199 Pac. 988, *supra*. The record seems to us singularly free from even slight technical error in view of the length of the trial and the involved nature of the problems presented.

The judgment is affirmed.

MACKINTOSH, C. J., TOLMAN, MAIN, and MITCHELL, JJ., concur.